THISSEN, Justice.
*598 In this case, we address the constitutionality of a provision of Minnesota's vehicle forfeiture statute found in Minn. Stat. § 169A.63 (2018). Specifically, we are asked to determine whether Minn. Stat. § 169A.63, subd. 9(d) -which sets forth the procedural requirements for judicial hearings related to vehicle forfeiture for a driving-while-impaired (DWI) offense-violates procedural due process rights guaranteed to respondents Helen and Megan Olson under both the United States Constitution and the Minnesota Constitution. The Olsons argue that the statute is unconstitutional on its face and as applied to them. The district court determined the statute is unconstitutional on its face. The court of appeals held that the statute is unconstitutional as applied to the Olsons. We conclude that the statute is constitutional on its face. We further conclude that the statute is constitutional as applied to Megan Olson, who did not own the vehicle, but is unconstitutional as applied to Helen Olson, a purportedly innocent owner. We therefore affirm in part and reverse in part.
FACTS
Megan Olson was arrested by the Shakopee Police Department for driving while impaired on August 16, 2015. Megan had three prior DWI convictions within the past 10 years. Generally, under Minn. Stat. § 169A.24, subd. 1(1) (2018), an individual who drives while impaired with three prior DWI incidents in the last decade may be charged with and convicted of a first-degree DWI offense.
A first-degree DWI offense is a "designated offense" under the DWI vehicle forfeiture statute, Minn. Stat. § 169A.63, subd. 1(e), which meant that the vehicle Megan was driving at the time she was arrested-a 1999 Lexus-was subject to forfeiture, see id. , subds. 2, 6(a). Consequently, Shakopee Police seized the vehicle incident to Megan's lawful arrest. Megan received notice of the seizure and intent to forfeit at the time of her arrest. Her mother, Helen Olson (the sole registered owner of the vehicle), received notice of the seizure and intent to forfeit shortly after the arrest. See id. , subd. 8(b) (requiring the seizing agency to provide the driver and any persons known to have an ownership, possessory, or security interest in the vehicle with "notice of the seizure and intent to forfeit the vehicle").
The DWI vehicle forfeiture statute, Minn. Stat. § 169A.63, states that when a driver in Minnesota is arrested on suspicion of committing a designated offense, the arresting agency may seize the vehicle used to commit the offense. See id. , subds. 2, 6(a). As soon as the seizure occurs, all "right, title, and interest in a vehicle subject to forfeiture ... vests in" the seizing agency. Id. , subd. 3. Independent actions for replevin are prohibited. Id . The seizure results in administrative forfeiture without a judicial hearing, id. , subd. 8(a), unless a person with an interest in the vehicle contests the forfeiture by filing a demand for judicial determination of the forfeiture-a civil lawsuit against the vehicle-in the county in which the vehicle was seized, see id. , subd. 8(e)-(f).
Once a demand for a judicial determination of the forfeiture is filed, subdivision 8(g) provides that the ensuing proceedings are governed by Minn. Stat. § 169A.63, subd. 9. The statute mandates that the hearing for the "judicial determination ... must be held at the earliest practicable *599 date, and in any event no later than 180 days following the filing of the demand by the claimant." Id. , subd. 9(d). But this deadline is subject to a consequential exception: the hearing "shall not be held until the conclusion of the criminal proceedings" underlying the seizure. Id. In other words, the DWI forfeiture statute bars any judicial hearing on the seizure or forfeiture of a vehicle until the criminal proceedings against the driver have concluded.
Because a seizure of a vehicle necessarily deprives the owner of the vehicle of her private property, the DWI forfeiture statute contains three provisions intended to alleviate potential hardship. First, subdivision 4 allows an owner to "give security or post bond payable to the [seizing] agency in an amount equal to the retail value of the seized vehicle" in exchange for having the vehicle returned. Id. , subd. 4. Notably, however, "the seized vehicle may be returned to the owner only if a disabling device is attached to the vehicle." Id. (emphasis added).
Second, subdivision 5a provides that any time before entry of a court order disposing of the forfeiture action, "any person who has an interest in forfeited property may file with the prosecuting authority a petition for remission or mitigation of the forfeiture." Id. , subd. 5a. The prosecutor alone has complete discretion to grant or deny the request. Id. To grant the petition, the prosecutor must find that the forfeiture was incurred without an intent to violate the law, without willful negligence, or that some other "extenuating circumstances" justify remission or mitigation. Id. But even if the prosecutor determines that one of those circumstances exists, the prosecutor may still deny the request. No provision allows for judicial review of the prosecutor's decision on a petition for remission or mitigation.
Finally, subdivision 7(d) provides a so-called "innocent owner" defense. See Laase v. 2007 Chevrolet Tahoe , 776 N.W.2d 431, 433 (Minn. 2009). A vehicle can be recovered if a petitioning owner can "demonstrate by clear and convincing evidence that the petitioning owner did not have actual or constructive knowledge that the vehicle would be used or operated in any manner contrary to law or that the petitioning owner took reasonable steps to prevent use of the vehicle by the offender." Minn. Stat. § 169A.63, subd. 7(d).[1] This defense has one key qualification: "If the offender is a family or household member of any of the owners who petition the court and has three or more prior impaired driving convictions, the petitioning owner is presumed to know of any vehicle use by the offender that is contrary to law."Id. (emphasis added). An innocent owner may only obtain judicial review of her defense by filing a demand for judicial determination. See id. , subd. 8(f)-(g). But that demand can only be heard after the underlying criminal proceedings are completed. Id. , subd. 9(d). The DWI forfeiture statute contains no exception allowing an innocent owner to demand a hearing on her claim before resolution of the underlying criminal proceedings.
On October 7, 2015, pursuant to Minn. Stat. § 169A.63, subd. 9(d), Megan and Helen Olson filed a timely joint demand for judicial determination of the forfeiture.
*600 They raised several defenses and claimed that the statute itself was unconstitutional for, among other things, violating their due process rights. Helen also asserted an innocent-owner defense.
Following the filing of the Olsons' petition, a hearing date was set for February 11, 2016. However, due to the forfeiture statute's requirement that any hearing be stayed until the conclusion of the criminal proceedings that caused the forfeiture, see id. , the hearing was continued several times. On October 12, 2016, just over one year after the Olsons' demand for judicial determination, Megan pleaded guilty to first-degree DWI. She was adjudicated guilty on February 13, 2017. Two days after Megan pleaded guilty, the Olsons moved for summary judgment on the forfeiture matter, arguing that the forfeiture statute violated due process by, among other things, failing to provide prompt review of the seizure itself. The forfeiture hearing was then scheduled for, and occurred on, February 23, 2017. By the time the Olsons received a hearing on the forfeiture of the Lexus, just over 18 months had passed since the vehicle had been seized. Throughout this entire period, the Olsons did not seek to recover the vehicle under the forfeiture statute's remission or mitigation provisions, nor did they post a bond for the vehicle. Additionally, Helen never requested an expedited hearing on her innocent-owner defense.
Following the hearing on their motion, the district court granted summary judgment to the Olsons and held that the forfeiture statute violated their procedural due process rights. The court ordered the return of the Lexus to the Olsons, but stayed judgment pending appeal.[2] The court of appeals affirmed the district court, concluding that Minn. Stat. § 169A.63, subd. 9(d), was constitutional on its face but unconstitutional as applied to each Olson. Olson v. One 1999 Lexus , 910 N.W.2d 72, 77, 80 (Minn. App. 2018). In concluding that the statute is facially constitutional, the court of appeals noted that procedural due process "could be satisfied if the related criminal matter" in a given case "was resolved promptly and a review hearing of the vehicle's seizure ... was timely held." Id. at 77 (emphasis added). As applied to the Olsons, however, the court of appeals found that the statute was unconstitutional because "the Olsons' forfeiture action was tied to the resolution of Megan's related criminal and implied-consent actions," such that "no hearing was held on the validity of the initial or continued seizure of the Lexus for over 18 months." Id. at 79. The court concluded that an 18-month wait "unconstitutionally denied the Olsons prompt review of the prehearing seizure of the Lexus."[3] Id. We granted the State's request for review.
ANALYSIS
This case presents three issues. First, we must determine what constitutional standard applies in evaluating the Olsons' procedural due process claims. Second, we must determine whether Minn. Stat. § 169A.63, subd. 9(d), violates procedural *601 due process requirements on its face. Finally, if we conclude that the statute is constitutional on its face, we must determine whether Minn. Stat. § 169A.63, subd. 9(d), violates procedural due process requirements as applied to Megan and Helen Olson's unique individual circumstances. We review questions of whether procedural due process has been violated de novo. Gams v. Houghton , 884 N.W.2d 611, 618 (Minn. 2016). When faced with a claim that a statute is unconstitutional, we "presume statutes are constitutional and will exercise our 'power to declare a statute unconstitutional with extreme caution and only when absolutely necessary.' " State v. Rey , 905 N.W.2d 490, 493 (Minn. 2018) (quoting State v. Craig , 826 N.W.2d 789, 791 (Minn. 2013) ).
I.
Both the United States and Minnesota Constitutions provide that the government shall not deprive a person of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1 ; Minn. Const. art. I, § 7. At its core, due process requires that the procedures used by the government before depriving an individual of his or her "protected life, liberty, or property interest" must "provide [that] individual with notice and an opportunity to be heard at a meaningful time and in a meaningful way." Sawh v. City of Lino Lakes , 823 N.W.2d 627, 632 (Minn. 2012) (citation omitted) (internal quotation marks omitted). This legal process is required to "minimize the risk of erroneous decisions," Mackey v. Montrym , 443 U.S. 1, 13, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979), and "to protect against arbitrary deprivation of property," Fuentes v. Shevin , 407 U.S. 67, 81, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). "[W]hen a person has an opportunity to speak up in his own defense, and when the State must listen to what he has to say, substantively unfair and simply mistaken deprivations of property interests can be prevented." Id . Further, "due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." Mathews v. Eldridge , 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (citation omitted) (internal quotation marks omitted) (alteration omitted). Rather, constitutional due process requirements are "flexible and call[ ] for such procedural protections as the particular situation demands." Id.
A.
A preliminary issue that we must address is whether we should use the test set forth in Barker v. Wingo , 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), or the framework set forth in Mathews , 424 U.S. at 335, 96 S.Ct. 893, to analyze and resolve the procedural due process claims raised in this case.
Barker was a Sixth Amendment case that considered whether the right to a speedy trial had been violated by prosecutorial delay. See 407 U.S. at 515-16, 92 S.Ct. 2182. The Barker Court identified four factors to be balanced in making that determination: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Id. at 530, 92 S.Ct. 2182. In United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in U.S. Currency , 461 U.S. 555, 564, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983), the Supreme Court applied the Barker factors when assessing procedural due process violations in a forfeiture case.[4]
*602 Mathews identified a different set of factors to balance when assessing procedural due process challenges:
First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
424 U.S. at 335, 96 S.Ct. 893 (citing Goldberg v. Kelly , 397 U.S. 254, 263-71, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) ). Further, when considering the nature of the private interest, we weigh "(1) the duration of the [deprivation of property]; (2) the availability of hardship relief; and (3) the availability of prompt postrevocation review." Heddan v. Dirkswager , 336 N.W.2d 54, 60 (Minn. 1983) (citing Montrym , 443 U.S. at 11-12, 99 S.Ct. 2612 ). The parties dispute which test-the Barker factors or the Mathews framework-should apply.
To decide whether the Barker factors or the Mathews framework applies, we must first identify the central question in this case. Because the Olsons do not assert that a pre-seizure hearing is required, we are left with the sole question of whether the 18-month delay between the seizure of the Lexus and the first hearing on the Olsons' demand for judicial determination-a delay driven by the mandate in Minn. Stat. § 169A.63, subd. 9(d), that no judicial hearing on the demand for judicial determination occur until after the related criminal proceedings are concluded-violates due process. As the Supreme Court has acknowledged, "there is no obvious bright line dictating when a post-seizure hearing must occur," $8,850 , 461 U.S. at 562, 103 S.Ct. 2005, but "there is a point at which an unjustified delay in completing a post-deprivation hearing would become a constitutional violation," Fed. Deposit Ins. Corp. v. Mallen , 486 U.S. 230, 242, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988) (citation omitted) (internal quotation marks omitted). The question of delay raises two related due process inquiries.
The first inquiry is to determine the urgency of the need for a prompt post-seizure judicial review of the substantive legal basis for the State's seizure of the vehicle. The Mathews framework is well suited to answering this question. The Mathews line of cases instructs us that the urgency of a prompt post-deprivation hearing is greater when the private interest is strong and the pre-deprivation procedures are relatively unreliable measures of whether the seizure is justified. Barry v. Barchi , 443 U.S. 55, 66, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979) ; see also Fedziuk v. Comm'r of Pub. Safety , 696 N.W.2d 340, 342, 346-48 (Minn. 2005) (holding that when a statute fails to provide any requirement of a prompt post-deprivation hearing, the Mathews factors direct that a pre-hearing seizure of property is unconstitutional on its face).
*603 Once we determine whether a greater or lesser urgency exists, we must assess whether the particular 18-month delay here was excessive in light of the level of urgency. The Barker factors provide a useful focus when we consider whether the particular delay in question is too long: In light of the relative urgency, did the State act diligently and articulate good reasons for any delay? Did those deprived of their property attempt to avoid the delay by asserting their available rights? Were those deprived of their property "hampered ... in presenting a defense on the merits, through, for example, the loss of witnesses or other important evidence[?]" $8,850 , 461 U.S. at 569, 103 S.Ct. 2005.
The parties dispute the answer to the first inquiry. Accordingly, that inquiry-the urgency of prompt post-seizure review-is paramount here and so we conclude that the Mathews framework presents the appropriate considerations to apply.[5]
This conclusion is supported by our own precedent. We have consistently applied Mathews to procedural due process claims over the years.[6] For instance, in 1984, soon *604 after the Supreme Court handed down $8,850 , we utilized the Mathews test to analyze whether a post-termination hearing was timely and provided procedural due process. See Eisen v. State Dep't of Pub. Welfare , 352 N.W.2d 731, 737 (Minn. 1984). Similarly, in 2005, we used the Mathews test in striking down Minnesota's implied consent license revocation provisions for failing to provide prompt meaningful post-revocation judicial review. See Fedziuk , 696 N.W.2d at 342, 346 ; see also id. at 346 n.7 (noting in dicta that "[q]uestions involving the promptness of postrevocation review involve the [claimant's] private interest, and we will consider it under that factor from Mathews ").[7] We therefore apply the Mathews framework to the claims raised by the Olsons.
B.
Having determined that Mathews provides the appropriate framework under which to consider this case, we turn to an overview of the three Mathews factors. The first factor is the nature of the private interest at stake. Generally, due process requires that an individual receive notice and an opportunity to be heard before the government takes her property. Mathews , 424 U.S. at 333, 96 S.Ct. 893. Difficult constitutional questions arise when determining whether an exception to that general rule should apply and what procedural protections are necessary in those circumstances. The private interest here, of course, is the Olsons' interest in their Lexus. "Automobiles occupy a central place in the lives of most Americans, providing access to jobs, schools, and recreation as well as to the daily necessities of life." Coleman v. Watt , 40 F.3d 255, 260-61 (8th Cir. 1994). Therefore, a person's interest in possessing and driving his or her vehicle is a significant, although not necessarily paramount, private interest. Cf. Montrym , 443 U.S. at 11, 99 S.Ct. 2612 (noting that the driver's interest "in continued possession and use of his license" is "a substantial one"); Dixon v. Love , 431 U.S. 105, 113, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977) (noting that a driver's license "may not be so vital and essential as ...
*605 social insurance payments" (citing Goldberg , 397 U.S. at 264, 90 S.Ct. 1011 )).
A person's property interest in a vehicle is not limited to its use value as a means of transportation. The economic value of a vehicle as property that can be sold, loaned, or used as collateral must also be considered. See United States v. James Daniel Good Real Prop. , 510 U.S. 43, 54-55, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) (noting that even though the claimant was renting his home to tenants, "[t]he rent represents a significant portion of the exploitable economic value of Good's home" and "cannot be classified as de minimis for purposes of procedural due process"). Further, where a person cannot be made economically whole after a wrongful deprivation, courts consider the private interest to be heightened. See id. at 56, 114 S.Ct. 492 ("[T]he availability of a postseizure hearing may be no recompense for losses caused by erroneous seizure.").
Procedural due process also demands reliability. The second Mathews factor in evaluating procedural due process claims is whether the process at issue poses a high "risk of an erroneous deprivation," 424 U.S. at 335, 96 S.Ct. 893, or whether it is "sufficiently reliable," Barchi , 443 U.S. at 65, 99 S.Ct. 2642, such that the pre-deprivation decision-making process is likely to have accurately analyzed the substantive legal authority under which the government took the private property. See Mallen , 486 U.S. at 241, 108 S.Ct. 1780 (noting that a finding by a "grand jury ... that there was probable cause to believe that [a federal bank officer] had committed a felony" was sufficient to justify suspension of the bank officer from his position without a pre-deprivation hearing); Barchi , 443 U.S. at 65, 99 S.Ct. 2642 (noting that an expert report concerning a horse drug test, combined with the regulatory requirement that a trainer has a duty to oversee horses in his care, is sufficiently reliable to support the suspension of the horse trainer's license); Mathews , 424 U.S. at 344, 96 S.Ct. 893 (noting that medical reports from a doctor regarding a disability were sufficiently reliable to support the temporary suspension of social security disability insurance benefits). The more straightforward the legal basis for seizing the property, the more likely a reliable pre-deprivation decision was made and, in turn, the more reliable the process at issue is at ensuring legally correct deprivations of property. Mathews , 424 U.S. at 344-45, 96 S.Ct. 893 (noting that the decision to discontinue disability benefits usually turns on "routine, standard, and unbiased medical reports by physician specialists," such that the "risk of error inherent in the truthfinding process" is minimal (citation omitted) (internal quotation marks omitted)); see also David , 538 U.S. at 718, 123 S.Ct. 1895 (noting the "straightforward nature" of spotting illegal parking renders towing errors unlikely). Courts proceed with greater skepticism about processes when the agency making the decision has a pecuniary interest in the outcome. James Daniel Good Real Prop. , 510 U.S. at 55-56, 114 S.Ct. 492.
Finally, the third factor in the Mathews balancing framework is the government interest. Procedural due process implicates government interests in at least two respects.
First, there are administrative considerations. Courts acknowledge that the government has limited resources and that more rigorous review processes are naturally more expensive and slower. See, e.g. , David , 538 U.S. at 718, 123 S.Ct. 1895 ("The administrative resources available to modern police departments are not limitless."); Montrym , 443 U.S. at 18, 99 S.Ct. 2612 ("[A] sharp increase in the number of hearings sought ... [would] impose a substantial *606 fiscal and administrative burden on the [State]."); Love , 431 U.S. at 114, 97 S.Ct. 1723 (acknowledging the burden a full administrative hearing can place on the government); Mathews , 424 U.S. at 347, 96 S.Ct. 893 (noting the increased cost of additional hearings are not an "insubstantial" burden).
Second, courts recognize that "extraordinary" circumstances may exist such that providing pre-seizure notice and a hearing interferes with a legitimate government interest. James Daniel Good Real Prop. , 510 U.S. at 53, 114 S.Ct. 492 ("We tolerate some exceptions to the general rule requiring predeprivation notice and hearing, but only 'in extraordinary circumstances where some valid government interest is at stake that justifies postponing the hearing until after the event.' " (quoting Fuentes , 407 U.S. at 82, 92 S.Ct. 1983 )); see also Calero-Toledo v. Pearson Yacht Leasing Co. , 416 U.S. 663, 679-80, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974) (holding that the pre-notice and pre-hearing seizure of a pleasure yacht capable of easy removal from the jurisdiction was an "extraordinary circumstance" justifying postponement of notice and a hearing). Courts have found that the government's interest in keeping repeat drunk drivers off the road is an extraordinary circumstance. Montrym , 443 U.S. at 19, 99 S.Ct. 2612 (describing the interest as "compelling"); Love , 431 U.S. at 115, 97 S.Ct. 1723 (describing the interest as "sufficiently visible and weighty").
The Mathews factors are more than a checklist of items to be ticked through selectively or by rote. The flexibility required of the due process analysis demands that the factors be actively balanced. For instance, "[t]he required degree of procedural safeguards varies directly with the importance of the private interest affected...." Henry J. Friendly, Some Kind of Hearing , 123 U. Pa. L. Rev. 1267, 1278 (1975). The more significant the private interest, the more certain we must be that the pre-deprivation assessment of the State's authority to take the property reached the right result. Conversely, a lack of meaningful pre-deprivation assessment of whether the legal justifications for seizure are likely present means that the government interest in moving ahead with a pre-hearing seizure must heavily outweigh the private interest at stake before the pre-hearing seizure is justified under due process. In applying this balancing, courts are most inclined to allow the government to take private property without a pre-deprivation hearing where the private interest is less compelling, the government's interest is strong, and the pre-deprivation process for assessing the substantive authority for the State's right to seize the property is sufficiently reliable such that courts are comfortable enough that mistakes are not made. Cf. Barchi , 443 U.S. at 64-65, 99 S.Ct. 2642.
But even if that constellation of factors exists, the relaxation of the general rule that a hearing should be held before the government takes property is only constitutionally permissible when there is a "prompt judicial or administrative hearing that would definitely determine the issue[ ]." Id. at 64, 99 S.Ct. 2642 ; see also Mallen , 486 U.S. at 241, 108 S.Ct. 1780 (rejecting the claim that a federal bank officer was denied a "sufficiently prompt" post-deprivation hearing); Mathews , 424 U.S. at 333, 96 S.Ct. 893 ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " (quoting Armstrong v. Manzo , 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965) )); Fedziuk , 696 N.W.2d at 344-45.
*607 In the most extreme case, if there is no provision for a meaningfully prompt post-deprivation merits hearing, seizing property without first giving a person notice and an opportunity to be heard violates due process on its face. Fedziuk , 696 N.W.2d at 342 (holding that a statute that lacked any requirement of a meaningful post-deprivation review at a meaningful time violated procedural due process rights on its face). And even in the more common case where the law provides for a post-seizure hearing, the urgency of the hearing varies as the balance of the Mathews factors shifts. When the private interest is more significant, the government interest is weaker, or our confidence that pre-deprivation processes accurately assessed the government's right to seize private property declines, the government's burden to justify a delay in the post-seizure hearing grows.
II.
We now turn to the due process claims raised by the Olsons.
A.
We first address the claim that Minn. Stat. § 169A.63, subd. 9(d), is facially unconstitutional. When a party claims that a statute violates due process on its face, that party "bear[s] the heavy burden of proving that the legislation is unconstitutional in all applications." Minn. Voters All. v. City of Minneapolis , 766 N.W.2d 683, 696 (Minn. 2009) ; see also United States v. Salerno , 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (noting that a facial challenge is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [legislation] would be valid"). This heavy burden stems from the presumption that "statutes are constitutional" such that we "exercise our power to declare a statute unconstitutional with extreme caution and only when absolutely necessary." Rey , 905 N.W.2d at 493 (citation omitted) (internal quotation marks omitted). We have held in certain contexts that if we can identify even "a single situation in which the [statute at issue] might be applied constitutionally, [a party's] facial challenge fails." McCaughtry v. City of Red Wing , 831 N.W.2d 518, 522 (Minn. 2013).
The Olsons urge us to adopt the district court's position and conclude that the forfeiture statute is unconstitutional on its face. They assert that the statutory requirement to postpone a hearing on a demand for judicial determination until the associated criminal proceedings are complete means that the demand for judicial determination can never be heard in a constitutionally prompt manner. We decline the invitation to hold the statute facially unconstitutional. Indeed, it seems unnecessary to address the facial validity of the DWI vehicle forfeiture statute because we conclude here that the statute is constitutional as applied to Megan.[8] Accordingly, *608 it is possible that the criminal proceedings underlying a DWI forfeiture case could be resolved with sufficient speed to satisfy due process. Because we can conceive of a circumstance where the legitimacy of the forfeiture (and the demand for judicial determination) can be resolved in a constitutionally prompt manner following the swift resolution of the underlying criminal proceedings, Minn. Stat. § 169A.63, subd. 9(d), is not "unconstitutional in all applications." Minn. Voters All. , 766 N.W.2d at 696. Consequently, the Olsons' facial challenge to Minn. Stat. § 169A.63, subd. 9(d), fails.
B.
We now turn to the Olsons' argument that the way the State applied Minn. Stat. § 169A.63, subd. 9(d), to their particular circumstances deprived them of their due process rights. We apply and balance the Mathews factors for Megan and Helen individually to determine whether Minn. Stat. § 169A.63, subd. 9(d), satisfies procedural due process.
We begin by identifying the substantive legal basis that ultimately would justify the State's seizure of the Olsons' vehicle. The State seized and seeks forfeiture of the Lexus under Minn. Stat. § 169A.63. To prevail, the State must prove that the vehicle was used in the commission of a "designated offense." Minn. Stat. § 169A.63, subd. 6. A person generally commits a "designated offense" if the person is convicted of driving while under the influence of alcohol and the person's record shows that he or she has driven under the influence three or more times in the last 10 years or was previously convicted of first-degree DWI offense. See Minn. Stat. §§ 169A.20, subd. 1, .24, subd. 1.
With regard to Helen Olson, an additional inquiry is required: Is Helen Olson protected by the statute's innocent-owner provisions? The State cannot seize a vehicle under the forfeiture statute if the registered owner of the vehicle is an innocent owner. See Minn. Stat. § 169A.63, subd. 7(d). The burden rests with the owner to "demonstrate by clear and convincing evidence that [the owner] did not have actual or constructive knowledge that the vehicle would be used or operated in any manner contrary to law or that the petitioning owner took reasonable steps to prevent use of the vehicle by the offender." Id. Further, "[i]f the offender is a family or household member of any of the owners who petition the court and has three or more prior impaired driving convictions, the petitioning owner is presumed to know of any vehicle use by the offender that is contrary to law." Id.
1.
First, we address Megan's as-applied due process claim. Under Mathews , we must balance the nature of her private interest, the State's functional and administrative interests, and the risk of erroneous deprivation to evaluate whether Megan received a sufficiently prompt post-seizure hearing on the merits of the seizure of the Lexus. See 424 U.S. at 335, 96 S.Ct. 893.
*609 On the whole, we do not find Megan's private interest in the Lexus to be particularly strong.[9] Megan is not a registered owner of the Lexus. She cannot claim that seizure of the vehicle deprives her of the economic value that could be derived from selling the vehicle or using the vehicle as collateral for a loan.[10] She does have an interest in the use value of the vehicle. According to Helen, Megan is the exclusive driver of the Lexus. But her interest in the use value of the vehicle is diminished because her license was previously cancelled for being "inimical to public safety." Consequently, she lacked the right to legally drive when the Lexus was seized. One cannot claim an interest, for the purposes of due process, in illegal activity. See Arbona-Custodio v. De Jesus-Gotay , 873 F.2d 409, 409 n.2 (1st Cir. 1989) (per curiam) (noting in the context of illegal hiring that a person has "no property interest" in illegally acquired positions). Therefore, to the extent Megan has any interest in the Lexus, it is limited to the potential that Megan could ask family or friends to use the vehicle to drive her to and from particular locations.
By contrast, the State's functional, fiscal, and administrative interest in the matter is strong. "[D]runken drivers pose a severe threat to the health and safety of the citizens of Minnesota[,] ... [and t]he state has a compelling interest in highway safety that justifies its efforts to keep impaired drivers off the road, particularly those drivers who have shown a repeated willingness to drive while impaired." State v. Wiltgen , 737 N.W.2d 561, 570 (Minn. 2007) (citation omitted) (internal quotation marks omitted). The Supreme Court has also recognized that this kind of public safety consideration is the type of extraordinary interest that should be considered in a procedural due process analysis. Montrym , 443 U.S. at 19, 99 S.Ct. 2612 ; Love , 431 U.S. at 115, 97 S.Ct. 1723. Additionally, as a matter of administrative and fiscal burden, the State's interest in seizing the vehicle without a full merits hearing on its right to forfeiture is strong. If courts were required to hold a prompt hearing shortly after a vehicle is seized in every single case of DWI forfeiture, it would add substantially to the cost and administrative burden of courts and prosecutors. See Booker v. City of Saint Paul , 762 F.3d 730, 736 (8th Cir. 2014). Indeed, in 2017 alone, there were 3,596 DWI-related forfeitures in Minnesota.[11] Requiring thousands of additional prompt post-seizure hearings annually would impose a significant burden and cost on courts and prosecutors.
Finally, we consider the risk of erroneous deprivation (and the value of any additional or substitute procedures to avoid such risk) to be low as applied to Megan. As noted above, the only substantive inquiry into whether the State ultimately may take the vehicle from Megan under section 169A.63 turns on whether Megan committed a "designated offense." Minn. Stat. § 169A.63, subd. 1(e)(1). This inquiry is *610 straightforward: (1) was Megan driving while intoxicated; and (2) did she have three prior DWI incidents in the last decade. See Minn. Stat. § 169A.24, subd. 1. The record does not provide much insight into the procedures used by the officer on the night of Megan's arrest, but we know, as discussed below, that the officer observed Megan that night and that he had probable cause to arrest her for driving under the influence of alcohol. Further, the Olsons' attorney noted during the forfeiture summary judgment hearing that the officer used a breath test to determine whether Megan was intoxicated. Additionally, records of prior offenses are typically captured in the State's database, an objective source of such information. In sum, given a breath test showing intoxication and other observations supporting the officer's determination of probable cause to arrest Megan for driving while impaired and an objective record of prior criminal offenses, we conclude that the State's determination that Megan committed the designated offense of first-degree DWI is reliable.
Buttressing the officer's observations and probable cause determination upon arrest are Minnesota criminal procedure rules requiring a judicial determination that the State has probable cause that Megan committed a first-degree DWI offense shortly after her arrest. See, e.g. , Minn. R. Crim. P. 4.02 - .03. Megan had access to-and did in fact obtain within a reasonable time after her arrest-a preliminary judicial hearing to address whether the State had probable cause for its DWI charge. We agree with the United States Court of Appeals for the Eighth Circuit, which has noted in evaluating the Minnesota DWI forfeiture statute that because "a driver arrested for first-degree impaired driving appears before a court at a preliminary hearing" in the criminal matter where the prosecutor must establish "that probable cause exists for the underlying DWI offense[,]" the risk of erroneous deprivation under the Minnesota DWI forfeiture statute is "uncompelling." Booker , 762 F.3d at 735-36 ; see also Coleman , 40 F.3d at 261 (noting that a delay in holding a post-deprivation hearing neither increases nor decreases the likelihood of erroneous deprivation).[12]
In sum, Megan has a limited private interest in keeping the Lexus. The State, on the other hand, has a strong interest in keeping repeat drunk drivers like Megan off the road and in temporarily seizing vehicles used by repeat drunk drivers without facing the burden of a prior automatic and immediate post-arrest/post-seizure *611 hearing. Finally, the observations of the police officer who stopped Megan and determined that probable cause existed to arrest her for driving while impaired, coupled with the objective evidence of her prior DWI convictions, are reliable and pose a limited risk of an erroneous determination that the State met the threshold for forfeiture of the Lexus. This combination of circumstances substantially reduces the urgency of a prompt merits hearing on the demand for judicial determination with respect to Megan. Cf. Barchi , 443 U.S. at 65-66, 99 S.Ct. 2642 ; Mathews , 424 U.S. at 343-44, 96 S.Ct. 893.
That is not to say that such a hearing can be delayed indefinitely. "[T]here 'is a point at which an unjustified delay in completing a post-deprivation proceeding would become a constitutional violation.' " David , 538 U.S. at 717, 123 S.Ct. 1895 (quoting Mallen , 486 U.S. at 242, 108 S.Ct. 1780 ). Megan argues that an 18-month wait without a hearing on her demand for judicial determination is simply too long under any circumstances for purposes of due process. Indeed, an 18-month delay has been held by the United States Supreme Court to be significant in some cases. See $8,850 , 461 U.S. at 565, 103 S.Ct. 2005. Furthermore, the Court has held that after property has been seized without a hearing, "the [property owner's] interest in a speedy resolution of the controversy becomes paramount...." Barchi , 443 U.S. at 66, 99 S.Ct. 2642. Comparatively, following the seizure, the State possesses "little or no ... interest ... in an appreciable delay in going forward with a full hearing." Id .
We find it important that when enacting the forfeiture statute, the Legislature determined that the pendency of criminal proceedings justifies some delay in hearing a demand for judicial determination, see Minn. Stat. § 169A.63, subd. 9(d), and that decision of a co-equal branch of government merits some deference. One reason the State proffers for this delay is the need to protect the criminally charged individual from incriminating herself in a civil proceeding. Undoubtedly, a civil hearing on forfeiture where the justification for forfeiture is identical to the basis for the criminal charges presents a difficult tactical decision for the person charged with a DWI offense. From a due process perspective, however, leaving that decision to the individual to weigh and choose seems preferable to the State mandating the choice for all individuals in advance. But aside from an attempt to protect the charged individual, the State has its own reasons for delaying civil forfeiture until the criminal proceedings are complete. In $8,850 , the Supreme Court noted:
Pending criminal proceedings present similar justifications for delay in instituting civil forfeiture proceedings. A prior or contemporaneous civil proceeding could substantially hamper the criminal proceeding, which-as here-may often include forfeiture as part of the sentence. A prior civil suit might serve to estop later criminal proceedings and may provide improper opportunities for the claimant to discover the details of a contemplated or pending criminal prosecution.
461 U.S. at 567, 103 S.Ct. 2005. These are legitimate reasons to support a delay, particularly in light of our conclusion that there is not an urgent need for a prompt post-seizure hearing for Megan.
Because Megan's private interest in the Lexus is less significant, because the State's interest is significant, and because the pre-seizure process for determining whether the ultimate forfeiture is authorized is reliable, we hold that while Megan waited for 18 months for a hearing on the demand for judicial determination pending *612 the resolution of her criminal charges, Minn. Stat. § 169A.63, subd. 9(d), is constitutional as applied to her.
2.
We now turn to Helen's as-applied challenge. Helen's private interest in the Lexus is more significant than Megan's interest. The State attempts to minimize the importance of Helen's private interest by noting that her driver's license, like Megan's, had also been cancelled as inimical to public safety.[13] But that fact merely diminishes-and does not eliminate-the use value of the vehicle to Helen.
More critically, the lack of driving privileges does not eliminate Helen's economic interest in selling, leasing, or using the vehicle as collateral to obtain financial benefits. Helen is the registered owner of the Lexus. But when the Shakopee Police seized the vehicle, "all right, title, and interest in the vehicle" immediately vested in the police department. Minn. Stat. § 169A.63, subd. 3. The seizure eliminates the exploitable financial value of the automobile to Helen during the period of deprivation. Cf. James Daniel Good Real Prop. , 510 U.S. at 54-55, 114 S.Ct. 492 (noting that eliminating the owner's ability to charge rent to tenants frustrated a "significant portion of the exploitable economic value of" the seized property). Further, Helen cannot recoup the loss of the economic value of the vehicle during the 18 months of seizure even if she is eventually deemed an innocent owner. Cf. id . at 56, 114 S.Ct. 492. In short, although Helen's private interest is not as strong as it would be if her license had been valid at the time of the seizure, her interest in the vehicle as both a financial asset and as property having social-use value makes her private interest stronger than Megan's interest.
The State's interest, in contrast, is weaker as applied to Helen than it is as applied to Megan. Certainly, the State's interest in keeping drunk drivers off the road remains present in the context of Helen's constitutional challenge. See Wiltgen , 737 N.W.2d at 570. After all, even though Helen was not the person driving while impaired, the Legislature has recognized that Helen's possible failure to prevent Megan from driving under the influence matters. See Minn. Stat. § 169A.06, subd. 7(d) (requiring purportedly innocent owners who are family or household members of the offender to show they either did not know their vehicle would be used unlawfully or that they "took reasonable steps" to prevent the use of the vehicle by the offender). Nonetheless, the fact that the vehicle was not seized because Helen was driving it while impaired means that the government interest in keeping repeat DWI offenders off the road weighs less with regard to her.
The other government interest-its fiscal and administrative interest in avoiding the cost and burden of numerous prompt post-seizure hearings-is also weaker in the context of Helen's innocent-owner defense. Because government seizure of a vehicle owned by one individual and driven by another individual is a subset of all designated DWI seizures, requiring a prompt hearing in innocent-owner cases poses less of a burden on courts and prosecutors. Further, the scope of such a hearing could be restricted to considering only the innocent-owner defense (and perhaps related hardship arguments by the non-offender claimant). Indeed, the State's argument that a more prompt hearing on a *613 demand for judicial determination under section 169A.63 would be burdensome is tempered by the fact that in other circumstances the Legislature requires hearings on the propriety of a vehicle seizure within as little as 96 hours. See, e.g. , Minn. Stat. § 609.5312, subds. 3(b), 4(b) (2018) (seizure of vehicles used in prostitution or to flee a police officer).[14] Consequently, requiring prompt preliminary seizure hearings for potentially innocent owners will impose less cost and burden on the court and prosecutors than a requirement for a prompt postseizure preliminary hearing in all DWI forfeiture cases.
The decisive Mathews factor in Helen's case, however, is the risk of erroneous deprivation. The substantive inquiry into whether the State ultimately may take the vehicle from Helen under section 169A.63 is two-fold: (1) did Megan commit a "designated offense," and (2) is Helen an innocent owner. See id. , subds. 1(e), 7(d). As noted in the discussion of Megan's due process violation claim, the determination of whether Megan committed the designated offense is straightforward and the pre-hearing steps to make that determination gives us confidence in its accuracy.
In contrast, however, the inquiry regarding the legal basis for forfeiture of Helen's vehicle-whether Helen is an innocent owner-received absolutely no consideration before the seizure. Indeed, there was no way for Helen to even raise the possibility that she is an innocent owner before a district court-much less show it through evidence-until the criminal charges against Megan were resolved, because the DWI forfeiture statute provides no probable cause hearing for potentially innocent owners, nor does it provide any mechanism by which such a claimant could speed up the hearing process. Consequently, the risk of erroneous deprivation for a purportedly innocent owner like Helen is significant. See Coleman , 40 F.3d at 261 (noting that "a more expeditious hearing would significantly reduce the harm suffered by owners [like Helen who are potentially] wrongly deprived of the use of their vehicles").
Helen was entitled to prompt judicial review of the seizure of her vehicle. Helen has a reasonably strong ownership interest in her vehicle. Moreover, the State's interest in ensuring that repeat DWI offenders are off the road applies with less force to a non-offender claimant like Helen. Most critically, Minn. Stat. § 169A.63 provides no assessment whatsoever-let alone a reliable assessment-that the State has the legal authority to permanently take the vehicle of a purportedly innocent owner like Helen. Under these circumstances, we hold that due process urgently requires a prompt hearing on innocent-owner defenses under the DWI forfeiture statute.
The State advances two additional arguments that we must address. First, the State argues (and the dissent emphasizes) that Helen cannot complain about the delay because she failed to vigorously assert her rights. This argument carries little weight. The only step legally required of the Olsons was filing the demand for judicial determination. Helen took that step in a timely manner. As the court of appeals *614 recognized, resisting the repeated continuances of the hearing on Helen's demand for judicial determination was futile given the statutory language requiring that such a hearing await resolution of the criminal charges against Megan.[15] See Olson , 910 N.W.2d at 76. Moreover, Helen had no basis or standing to force Megan to expedite her criminal DWI case.[16]
Second, the State argues that the mitigation, remission, and bond procedures set forth in Minn. Stat. § 169A.63 afforded Helen the opportunity to recover her vehicle from the State before a merits hearing and that the existence of such procedures justifies the delay or, at the very least, mitigates the constitutional harm caused by the delay. We disagree.
Certainly, meaningful hardship relief is an important consideration when evaluating due process demands. We have noted that the presence of meaningful hardship relief constitutes a "significant factor[ ]" in favor of an existing state procedure. See Heddan , 336 N.W.2d at 60. In this case, however, the mitigation, remission, and bond provisions of Minn. Stat. § 169A.63 are largely illusory forms of hardship relief.
The provision allowing a person to request remission or mitigation, see Minn. Stat. § 169A.63, subd. 5a, gives the prosecutor unfettered, standardless discretion to decide whether to grant mercy to the person requesting remission. Accordingly, while the discretionary mitigation and remission provisions may provide some useful practical relief as a way to resolve the dispute informally if the prosecutor decides to be magnanimous, that practical value is irrelevant to the due process analysis.
Due process is not satisfied by a rule that allows a person's property right to turn on the whim of a prosecutor. The Supreme Court has long cautioned against the constitutional vagaries of statutes that "provide such minimal guidelines" so as to permit "a standardless sweep [that] allows ... prosecutors ... to pursue their personal predilections." Kolender v. Lawson , 461 U.S. 352, 358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (citation omitted) (internal quotation marks omitted) (first alteration in original); see also Sessions v. Dimaya , --- U.S. ----, 138 S.Ct. 1204, 1212, 200 L.Ed.2d 549 (2018) ; Papachristou v. City of Jacksonville , 405 U.S. 156, 168, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972) ; Kunz v. New York , 340 U.S. 290, 294, 71 S.Ct. 312, 95 L.Ed. 280 (1951). Informal proceedings and vague standards are not favored in the law; they are breeding grounds for potential abuse. Indeed, "if arbitrary and discriminatory enforcement *615 is to be prevented, laws must provide explicit standards for those who apply them," or else we risk "delegat[ing] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." Grayned v. City of Rockford , 408 U.S. 104, 108-09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).
That is not to say that we believe prosecutors frequently abuse their discretion or that prosecutors do not take seriously their legal and ethical obligations to enforce the law fairly and equally. But the Bill of Rights "protects us against the Government; it does not leave us at the mercy of noblesse oblige . We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly." United States v. Stevens , 559 U.S. 460, 480, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) ; see Nielsen v. 2003 Honda Accord , 845 N.W.2d 754, 761 (Minn. 2013) (Anderson, J., concurring) (noting that a statutory forfeiture scheme that gives seizing authorities a pecuniary interest in property seized is "inconsistent with historic American insistence on checking authority. As James Madison observed long ago, 'If men were angels, no government would be necessary.' " (quoting The Federalist No. 51, at 398-99 (James Madison) (J.B. Lippincott ed., 1880))).
The bond option is equally illusory hardship relief for Helen. The bond provision requires a claimant to post a bond for the full retail value of the vehicle-a potentially heavy financial burden that diminishes the value of the bond option as hardship relief-in exchange for receiving the vehicle back in a disabled state. Minn. Stat. § 169A.63, subd. 4 (requiring a vehicle returned on bond to be disabled). Helen aptly notes that because the vehicle is returned in a disabled state, the owner is essentially entitled to decide where to park the vehicle under the bond provision.
Overall, asking for mercy from a prosecutor, or posting a retail value bond in exchange for an unusable vehicle, is not meaningful hardship relief. By extension, the failure of Helen to request remission or mitigation, or post a bond, does not forfeit Helen's constitutional due process right to a prompt hearing to address her innocent-owner defense.
In view of the urgency of holding a prompt post-forfeiture hearing on Helen's innocent-owner defense, the 18-month delay suffered by Helen was not meaningful review at a meaningful time. The Supreme Court's directive that after property has been seized without a hearing, "the [property owner's] interest in a speedy resolution of the controversy becomes paramount," Barchi , 443 U.S. at 66, 99 S.Ct. 2642, applies with substantial force to Helen's situation. The State argues that delaying the civil hearing is nonetheless justified by the need to avoid compromising the government's criminal case against Megan. But that argument carries considerably less weight in the context of purportedly innocent owners like Helen. First, the evidence needed to show whether Helen knew that Megan would drive under the influence-the heart of the innocent-owner defense-is largely distinct from and irrelevant to the criminal case against Megan. District courts in civil cases have tools to resolve those issues in a manner that does not impinge upon constitutional rights. Second, Megan would be well within her Fifth Amendment rights to refuse to testify in the civil hearing on the innocent-owner defense. See Parker v. Hennepin Cty. Dist. Court, Fourth Judicial Dist. , 285 N.W.2d 81, 82 (Minn. 1979). But the fact that asserting an innocent-owner defense may be challenging cannot deprive *616 someone of a constitutional right to due process.
Ultimately, the balance of interests demonstrates that Helen's right to procedural due process was denied as a result of the 18-month delay between the seizure of her property and the hearing on her demand for judicial determination, including in particular her innocent-owner defense.
III.
The only remaining question is what remedy to provide to Helen. We conclude that the district court properly ordered the State to return the Lexus to Helen. She now has been without her vehicle for three years. Requiring Helen to participate in a hearing to prove her innocent-owner defense after holding that she was unconstitutionally denied a prompt hearing would undermine our conclusion that it was the process she was forced to endure that was the problem. Such a remedy would ring hollow. Instead, we hold that justice is served by the return of her vehicle. Furthermore, Helen should not be required to pay any costs incurred by the State in storing her vehicle; to require her to do so would be to charge her for succeeding in having her constitutional rights vindicated.
CONCLUSION
For the forgoing reasons, we affirm the court of appeals' holding that Minn. Stat. § 169A.63, subd. 9(d), is constitutional on its face, but unconstitutional as applied to Helen Olson. We reverse the court of appeals' holding that the statute is unconstitutional as applied to Megan Olson. We remand to the district court for proceedings in accordance with this decision.
Affirmed in part, reversed in part.
Concurring in part, dissenting in part, Gildea, C.J., McKeig, J.
CONCURRENCE & DISSENT
GILDEA, Chief Justice (concurring in part, dissenting in part).
I concur in part and dissent in part. I agree with the majority that the statute is constitutional on its face.
I also agree with the majority that the statute is constitutional as applied to Megan. I part company with the majority with respect to Helen. In my view, the statute is constitutional as applied to Helen as well.
Unlike the majority, I would apply the test the Supreme Court articulated in Barker v. Wingo , 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). As the majority acknowledges, the Court applied Barker in a forfeiture case. See United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in U.S. Currency , 461 U.S. 555, 564, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983). I would likewise apply Barker to this forfeiture case.[1] Under the Barker analysis, the statute is constitutional as applied to both Megan and Helen.
Under Barker , we examine the "[l]ength of the delay, the reason for the delay, the defendant's assertion of [her] right, and prejudice to the defendant." 407 U.S. at 530, 92 S.Ct. 2182. The delay here was due in part to continuances in the criminal case pending against Megan. Helen agreed to be jointly represented with Megan even *617 though their interests relative to the car and the criminal case are different. And as their counsel told the district court at the summary judgment hearing, the defense could have pushed for the criminal case to get to trial quickly, which would have resulted in a quicker resolution of this civil forfeiture proceeding. Yet, as counsel acknowledged, the defense did not do so.
It is also true, as the majority notes, that Helen partially asserted her rights in that she jointly filed with Megan a demand for judicial determination of the forfeiture. But Helen did not press for a hearing on her claim that she was an "innocent owner" under the statute. See Minn. Stat. § 169A.63, subd. 7(d) (2018) (providing in part that "[a] motor vehicle is not subject to forfeiture under this section if any of its owners ... can demonstrate by clear and convincing evidence that the petitioning owner did not have actual or constructive knowledge that the vehicle would be used or operated in a manner contrary to law"). Helen and Megan essentially took no action in the forfeiture proceeding until they filed their motion for summary judgment a year after they filed their demand.
The majority contends that any attempt by Helen to pursue a speedy resolution of the forfeiture matter would have been "futile" because the statute does not permit judicial determination of the forfeiture until Megan's criminal case is resolved. The statute postpones judicial review of the forfeiture until the conclusion of criminal proceedings in a "related" criminal case. Minn. Stat. § 169A.63, subd. 9(d) (2018). Because Helen was not the driver at issue and she claims to be an innocent owner, it could be that there is no "related" criminal case here. That is at least a plausible reading of the statute, but a reading that is not before us because of Helen's decision to delay the forfeiture determination until Megan's criminal case was resolved. See State ex rel. Forslund v. Bronson , 305 N.W.2d 748, 751 (Minn. 1981) ("It is well established that if a statute is ambiguous, the construction which avoids constitutional conflict is preferred although such construction may be less natural."); see also Minn. Stat. § 645.17(3) (2018) ("[T]he legislature does not intend to violate the Constitution of the United States or of this state."). In short, the delay here is largely the result of choices that Helen made.
Moreover, Helen did not take advantage of her right to petition the county attorney for return of her vehicle, a remedy the statute clearly provides. See Minn. Stat. § 169A.63, subd. 5a (2018) ("[A]ny person who has an interest in forfeited property may file with the prosecuting authority a petition for remission or mitigation of the forfeiture."). As one court has noted with respect to a similar federal statute, "[p]etitions for remission or mitigation of forfeiture provide a means for ameliorating the harshness of forfeiture when mitigating circumstances exist." Kiefer v. U.S. Dep't of Justice , 687 F.Supp. 1363, 1366 (D. Minn. 1988). The majority dismisses the statutory remedy, contending that it is effectively meaningless because no standards govern the county attorney's decision-making. I disagree.
The statute calls for a fact-specific determination, and as applied here, there are standards that would guide the county attorney's determination. See Minn. Stat. § 169A.63, subd. 5a (explaining that the prosecutor can "remit or mitigate the forfeiture" on reasonable terms and conditions "if the prosecuting authority finds that: (1) the forfeiture was incurred without willful negligence or without any intention on the part of the petitioner to violate the law; or (2) extenuating circumstances justify the remission or mitigation of the forfeiture."). There are standards here because Helen's argument is that she is an *618 innocent owner. The statute, in subdivision 7(d), identifies how the innocent-owner determination is to be made. See Minn. Stat. § 169A.63, subd. 7(d) (explaining owner's burden to prove lack of knowledge that vehicle would be used contrary to law and providing for presumption of knowledge if the driver has three or more "prior impaired driving convictions"). Accordingly, had Helen invoked the statutory remission remedy in subdivision 5a, there would have been a standard for the county attorney to apply in assessing whether Helen is, in fact, an innocent owner and therefore entitled to the return of her vehicle.
Given that the burden of proving unconstitutionality is on Helen, see, e.g. , Singer v. Comm'r of Revenue , 817 N.W.2d 670, 675 (Minn. 2012), it is not too much in my view, to require Helen to show that she took advantage of all available remedies the statute provides for her before we conclude that she met her burden. It might be, as the majority speculates, that the county attorney would not carry out its responsibility under the remission statute. But we typically do not assume the worst in our government officials.
Our precedent, instead, counsels the opposite. Indeed, we have said that "public officers are presumed to have done their duty and acted within the limits of their statutory powers and that the burden to overcome the presumption rests with the party contending to the contrary." State ex rel. South Saint Paul v. Hetherington , 240 Minn. 298, 61 N.W.2d 737, 742 (1953) ; see also Brookfield Trade Ctr., Inc. v. County of Ramsey , 609 N.W.2d 868, 876 (Minn. 2000) (stating that evidence is "viewed in the context of a presumption that the county assessor, as a government official, properly performed his official duties and complied with statutory procedures" in certifying minimum market value of property); R.E. Short Co. v. City of Minneapolis , 269 N.W.2d 331, 337 (Minn. 1978) ("[W]e presume that public officials are properly performing their duties when they make ... decisions [about determinations that a project serves a public purpose]."); Otter Tail Power Co. v. Village of Elbow Lake , 234 Minn. 419, 49 N.W.2d 197, 205 (1951) ("We must presume that the village will act in good faith in the performance of its covenants."); State ex rel. Ames v. City Council of Minneapolis , 87 Minn. 156, 91 N.W. 298, 300 (1902) ("We must presume, in the absence of any showing to the contrary, that the council acted in good faith....").
I would adhere to that presumption here. In the absence of a record that the county attorney was in fact arbitrary and capricious in addressing a petition for remission submitted under subdivision 5a of the statute, I would not hold that the statute as applied to Helen is unconstitutional based on the assumption that the county attorney would behave so.
Finally, in terms of prejudice, Helen has not shown or even argued that the delay impacted her ability to prove that the forfeiture was improper. See $ 8,850 , 461 U.S. at 567, 103 S.Ct. 2005 (discussing prejudice in terms of impact on claimant's case). The majority does not contend otherwise, but notes that Minnesotans have an important interest in transportation that forfeiture of personal vehicles negatively impacts. That may be true in the abstract, but it is not true here. Because of her unlawful driving behavior, Helen has forfeited any interest in using her (or any other) car for transportation.
I agree with the majority that Helen still has an economic interest in the car. But the delay in getting back a car that she cannot drive is not sufficient prejudice to support the conclusion that the statute is unconstitutional. See *619 Phillips v. Comm'r , 283 U.S. 589, 596-97, 51 S.Ct. 608, 75 L.Ed. 1289 (1931) ("Where only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for the ultimate judicial determination of the liability is adequate."); see also Sisson v. Triplett , 428 N.W.2d 565, 569 (Minn. 1988) (quoting the same).
In sum, I would follow the Barker factors, and based on my analysis of those factors, I would hold that Helen has not met her burden to prove that the statute is unconstitutional as applied to her.
MCKEIG, Justice (concurring and dissenting).
I join in the concurrence and dissent of Chief Justice Gildea.

Subdivision 7(d) used to refer only to the "owner" of the vehicle, as opposed to its current language referring to the "owners who petition the court" or "petitioning owner." Compare Minn. Stat. § 169A.63, subd. 7(d) (2016), with Minn. Stat. § 169A.63, subd. 7(d) (2018). The Legislature amended the language in 2017. See Act of Apr. 3, 2017, ch. 12, § 1, 2017 Minn. Laws 43, 44. Here, the change is immaterial because Helen is the only registered owner of the Lexus.

Because the district court held that the statute was unconstitutional, it did not reach the question of whether Helen Olson was an innocent owner or any other constitutional questions raised by the parties.

The court of appeals also found that although respondents agreed to delay the forfeiture hearing several times, they did not forfeit the right to challenge the lack of prompt judicial review because the language of section 169A.63, subdivision 9(d), required any hearing on the matter to be stayed until the criminal proceedings were concluded. Olson , 910 N.W.2d at 76. Thus, any attempt to expedite review was futile under the statute. See id. We agree with this conclusion.

The State and the Attorney General (as amicus) point to United States v. Von Neumann , 474 U.S. 242, 106 S.Ct. 610, 88 L.Ed.2d 587 (1986), to support their position that Barker applies, arguing that it expanded the reach of $8,850 to encompass the claims at issue here. We read Von Neumann far more narrowly. The Von Neumann Court dealt with the question of whether a 36-day delay by the United States Customs Service in responding to a defendant's petition for remission -submitted before the government's filing of a forfeiture proceeding-constituted an unconstitutional delay. See id. at 245-47, 106 S.Ct. 610. Far from expanding $8,850 , the Court simply held that remission petitions were "not necessary to a forfeiture determination, and therefore are not constitutionally required." Id. at 250, 106 S.Ct. 610. In other words, no constitutional due process protections attached to the remission petition. Consequently, the State and Attorney General's reliance on Von Neumann is misplaced.

In many ways this is a false choice because the Barker factors and Mathews framework either overlap, or the Barker factors are implicitly embedded in the Mathews framework. For instance, both the Barker and Mathews tests focus on the duration of the delay and consequent deprivation of the claimant's interest. Compare Barker , 407 U.S. at 530-32, 92 S.Ct. 2182, with Mathews , 424 U.S. at 335, 341-42, 96 S.Ct. 893. The second Barker factor-the reason for the delay in holding a hearing on the propriety of the seizure-illuminates the Mathews inquiry into the government's interest. As noted in Barchi , once a deprivation takes place, the government's interest in a prompt resolution parallels that of the person deprived of her property. 443 U.S. at 66, 99 S.Ct. 2642. Generally, the State possesses "little or no ... interest ... in an appreciable delay in going forward with a full hearing." Id . But it is not unreasonable to provide the State with a chance to point to ongoing government interests that may justify a delay. Both the third and fourth Barker factors-the assertion of rights by the person whose property was seized and any prejudice to that person resulting from the delay, 407 U.S. at 531-32, 92 S.Ct. 2182 -reflect important considerations when assessing the nature and strength of that person's private interest. If a person is less diligent in pursuing her right to relief, her private interest may not be as strong. On the other hand, the ability of a person deprived of property to hold the government to account without the loss of evidence or faded memories that can sometimes accompany a long delay is an important private interest that is not fully captured in the traditional Mathews inquiry into "private interest." The fourth Barker factor also is relevant in determining whether there is a risk of erroneous deprivation. Cf. Los Angeles v. David , 538 U.S. 715, 718, 123 S.Ct. 1895, 155 L.Ed.2d 946 (2003) (per curiam) (considering fact that 30-day delay is unlikely to spawn significant factual errors under the erroneous-deprivation prong of Mathews test). Even though we conclude that Mathews is the proper framework in this case, we will apply insights from Barker and $ 8,850 where appropriate.

See, e.g. , Gams , 884 N.W.2d at 619 (naming Mathews as the balancing test used to assess a procedural due process claim); Rew v. Bergstrom , 845 N.W.2d 764, 785-86 (Minn. 2014) (applying Mathews in a procedural due process challenge); Sawh , 823 N.W.2d 627, 632 (Minn. 2012) (noting that Mathews sets forth the test for the "constitutional adequacy of specific procedures"); State v. Wiltgen , 737 N.W.2d 561, 568 (Minn. 2007) ("Since 1982 ... we have consistently employed the three-part test established in Mathews ... to determine whether prehearing revocations violate due process."); Bendorf v. Comm'r of Pub. Safety , 727 N.W.2d 410, 415-16 (Minn. 2007) (explicitly noting that Mathews is used to evaluate "the sufficiency of procedural protections"); Hamilton v. Comm'r of Pub. Safety , 600 N.W.2d 720, 723-24 (Minn. 1999) (applying Mathews to evaluate whether a mandatory 30-day waiting period for a limited license under the license revocation statutes satisfied procedural due process); Falgren v. State Bd. of Teaching , 545 N.W.2d 901, 908-09 (Minn. 1996) (applying Mathews to a procedural due process challenge to the use of offensive collateral estoppel in a teaching license revocation matter); Martin v. Itasca County , 448 N.W.2d 368, 370 (Minn. 1989) (applying Mathews in evaluating a procedural due process challenge to a leave-of-absence policy); Violette v. Midwest Printing Co.-Webb Publ'g , 415 N.W.2d 318, 323 (Minn. 1987) (noting that Mathews is the "proper test for determining whether [a statute] affords all process that is constitutionally due"); In re Harhut , 385 N.W.2d 305, 311 (Minn. 1986) (applying Mathews to a procedural due process challenge to indeterminate civil commitment statute); Machacek v. Voss , 361 N.W.2d 861, 863 (Minn. 1985) (applying Mathews to a procedural due process challenge to required temporary child support payments in paternity proceedings); Heddan , 336 N.W.2d at 59 (applying Mathews to a procedural due process challenge to pre-hearing license revocation process); State ex rel. Taylor v. Schoen , 273 N.W.2d 612, 617 (Minn. 1978) (applying the Mathews test to determine what process was due in the parole release decision-making process).

This conclusion is also consistent with other courts that have considered the question of whether Mathews or Barker applies. See, e.g. , Smith v. City of Chicago , 524 F.3d 834, 836-38 (7th Cir. 2008), vacated as moot sub nom. Alvarez v. Smith , 558 U.S. 87, 130 S.Ct. 576, 175 L.Ed.2d 447 (2009) ; Krimstock v. Kelly , 306 F.3d 40, 68 (2d Cir. 2002) ; United States v. Jones , 160 F.3d 641, 645-46 n.3 (10th Cir. 1998) ; Holman v. Hilton , 712 F.2d 854, 858 n.4 (3d Cir. 1983) ; Washington v. Marion Cty. Prosecutor , 264 F.Supp.3d 957, 974-75 (S.D. Ind. 2017) ; Brown v. District of Columbia , 115 F.Supp.3d 56, 65-66 (D.D.C. 2015) ; Booker v. City of Saint Paul , No. 12-CV-203 (SRN/SER), 2013 WL 4015352, at *17 (D. Minn. Aug. 6, 2013), aff'd , 762 F.3d 730 (8th Cir. 2014) ; Simms v. District of Columbia , 872 F.Supp.2d 90, 99-100 (D.D.C. 2012).

In fact, because the procedural due process balancing under Mathews is so fact-intensive, it makes sense that in most cases asserting a due process violation based on a deprivation of property (like the instant challenges by the Olsons) a constitutional challenge will and should be decided on an as-applied basis. Addressing a facial challenge prior to an as-applied challenge makes sense where the facial challenge is intended to preserve constitutional interests that are broader than the specific case before the court, such as a concern about chilling free speech. See, e.g. , Schad v. Borough of Mount Ephraim , 452 U.S. 61, 66, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) (holding that appellants had standing to raise an overbreadth claim against a zoning ordinance prohibiting all live entertainment, and noting without deciding-in the context of a fine imposed on a business that provided live nude dance shows to its clientele-that nude dancing is entitled to some First Amendment protections). And there are cases where a facial challenge may be proper and preferred even in the context of a due process challenge. For instance, there are cases where the right to be deprived is so significant that a pre-deprivation hearing is always required. See, e.g. , Goldberg , 397 U.S. at 264, 90 S.Ct. 1011 (noting that the deprivation of welfare benefits "may deprive an eligible recipient of the very means by which to live"). In other cases, a statute may be so structurally flawed by wholly lacking an essential due process protection that the statute is properly invalidated on its face. See, e.g. , Fedziuk , 696 N.W.2d at 342 (holding that the complete absence of any deadline for a judicial hearing rendered the statute facially unconstitutional).

Notably, Megan tried to withdraw from the forfeiture proceeding at the court of appeals by claiming that she was not the owner of the vehicle. Her withdrawal request was granted, Olson v. One 1999 Lexus , No. A17-1083, Order (Minn. App. filed Mar. 1, 2018), and then subsequently reversed without explanation upon reconsideration by the court of appeals, Olson , No. A17-1083, Order (Minn. App. filed Mar. 21, 2018).

According to Helen, Megan is the sole person responsible for repairs to the Lexus. But there is no evidence that Megan would, for instance, receive the proceeds from the sale of the vehicle.

See Rebecca Otto, State of Minn. Office of the State Auditor, Criminal Forfeitures in Minnesota for the Year Ended December 31, 2017 , at 12-14 (June 12, 2018).

The Olsons argue that the reliability of the preliminary determination that a DWI offender's vehicle may be seized is undermined to a degree by the fact the police and the prosecutor share the proceeds from the sale of the vehicle once it is legally forfeited. See Minn. Stat. § 169A.63, subd. 10(b)(1)-(2) (providing that the seizing agency receives 70 percent of the proceeds, while the prosecuting agency receives 30 percent); see also James Daniel Good Real Prop. , 510 U.S. at 56, 114 S.Ct. 492 (noting the need for heightened scrutiny where the government has a pecuniary interest in a seizure). The impact of that alleged conflict of interest is limited, however, because a driver's DWI history is an objective record fact and because the police officer's decision that probable cause exists to arrest a person for driving while impaired is independent of, and preliminary to, the question of whether the conduct is a "designated offense" that authorizes a seizure and forfeiture. There is no evidence in this record that the arresting police officer was motivated by anything other than his observation of Megan's driving. And, of course, that decision of the police officer is quite quickly reviewed by a judge. Further, the record does not disclose how many vehicles the Shakopee Police Department seizes on an annual basis. Consequently, while the pecuniary interest of both the prosecuting and seizing agencies may raise the risk of erroneous deprivations in some cases, we find no such heightened risk here.

The record fails to disclose whether or when Helen's driver's license could be reinstated.

During the required hearing under Minn. Stat. § 609.5312, subd. 3 (2018), for instance, the prosecuting authority must certify its plans to prosecute the underlying crime. The owner has a chance to assert defenses to forfeiture (including an innocent-owner defense). See id., subd. 2 (2018). The owner may also appeal to the court (in contrast to an appeal to the prosecutor) for remission or mitigation. See id. , subd. 3(b)(3). Such a hearing-though tightly limited-provides substantially more due process than the DWI forfeiture statute at issue here.

The dissent places great import on Helen's failure to object to the continuances. Although the dissent asserts that the forfeiture proceeding was continued six times without objection from Helen, the record discloses only one instance where Helen affirmatively agreed to a continuance. A motion objecting to each continuance required, at the time, a filing fee of $100 per response. See Minn. Stat. § 357.021, subd. 2(4) (2016). Moreover, resisting the motions for continuance was indisputably futile in light of the statutory mandate that hearings on judicial determinations must wait until resolution of the criminal case. See Minn. Stat. § 169A.63, subd. 9(d). The cost of responding to multiple continuance motions, and the futility of challenging the delay itself, renders the fact of the continuances a thin reed upon which to justify depriving Helen of her constitutional due process rights.

The State argues that because the Olsons shared the same attorney, Helen possessed some ability to control the pace of Megan's underlying criminal proceeding. That Helen and Megan's lawyer may have had a waivable conflict of interest, however, has no bearing on the constitutional rights at issue here. In the end, Helen still lacks any ability to force Megan to plead guilty or in any way speed up the process of criminal prosecution.

The majority relies on the three-part balancing test from Mathews v. Eldridge , 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), because we relied on that test in Fedziuk v. Commissioner of Public Safety , 696 N.W.2d 340, 344-45 (Minn. 2005). Fedziuk arises in the context of license revocation under the implied consent law; it is not a forfeiture case. See Fedziuk , 696 N.W.2d at 342.