STATE OF MINNESOTA

IN SUPREME COURT

A22-1065
A22-1066

Court of Appeals                                                                    Thissen, J.
                                                            Took no part, Procaccini, J.

In the Matter of the Welfare of the
Children of: G.A.H. and S.T., Parents (A22-1065).


In the Matter of the Welfare of the
Children of: S.T. and A.D., Parents (A22-1066).          Filed:  December 13, 2023
                                                         Office of Appellate Courts

_____

Angela J. Sonsalla, Perham, Minnesota, for appellant.

Kathleen J. Schur, Assistant Otter Tail County Attorney, Fergus Falls, Minnesota, for respondent.

Mallory K. Stoll, Blahnik, Prchal & Stoll, PLLC, Prior Lake, Minnesota;

Natalie Netzel, Mitchell Hamline School of Law, Saint Paul, Minnesota; and

Brooke Beskau Warg, Hennepin County Adult Representation Services, Minneapolis, Minnesota, for amici curiae Institute to Transform Child Protection and Hennepin County Adult Representation Services.

John L. Lovasz, Assistant Chisago County Attorney, Center City, Minnesota for amicus curiae Minnesota County Attorneys Association.

_____

1

A parent who failed to appear for the final day of a multiple-day termination of parental rights trial is not entitled to reversal of the district court's order refusing to continue or reschedule the trial to allow the parent to testify, offer additional witnesses and cross-examine witnesses when, notwithstanding the parent's argument that this violated her procedural due process rights, the parent failed to carry her burden of showing prejudice such that the outcome of the trial was materially affected.

Affirmed.

O P I N I O N

THISSEN, Justice.

Appellant S.T. appeals from an order issued under Minnesota Rule of Juvenile Protection Procedure 18.02 terminating her parental rights to one child and permanently transferring physical and legal custody of two additional children. Rule 18.02 allows entry of a default order terminating parental rights following nonappearance by a parent if the petition is proved by clear and convincing evidence.[1] Here, after appearing at the first several days of trial, S.T. did not personally appear for a rescheduled trial date. Instead, she called court administration during the proceeding. Trial proceeded in her absence pursuant to Minnesota Rule of Juvenile Protection Procedure 18.01, which provides, in

---

[1] In *In re Welfare of Child of H.G.D.*, we explained that Rule 18.02 does not result in entry of a true default judgment because it does not permit entry of judgment solely on the parent's failure to appear; rather, county social services must still prove the allegations in the petition by the applicable standard of proof. 962 N.W.2d 861, 870 (Minn. 2021) ("[T]he district court could not simply accept the allegations in the County's petition as true when mother failed to appear for the pretrial hearing.").

pertinent part, that "the court may receive evidence in support of the petition or reschedule the hearing" if a parent fails to appear for a trial after proper service. The district court refused to continue or reschedule the trial, S.T. was not permitted to testify, and her counsel was not permitted to call witnesses or cross-examine the guardian ad litem. We conclude that S.T. has not shown that the district court's refusal to continue or reschedule the hearing resulted in prejudice warranting reversal.

## FACTS

S.T. is the mother of three children, T.J.D., T.A.D., and T.F.T. G.A.H. is the father of T.F.T. A.D. is the father of T.J.D. and T.A.D. This appeal arises from a petition to terminate S.T.'s parental rights filed by Otter Tail County (the "County").

Otter Tail County District Court terminated S.T.'s parental rights to T.F.T. and involuntarily transferred permanent legal and physical custody of T.J.D. and T.A.D. to their father, A.D., on June 15, 2022. As discussed in more detail below, this termination and transfer occurred 681 days after the children were first removed from S.T.'s care. The decision followed a multiple-day trial that occurred over several months. The start date of the trial was reset twice and the proceeding was continued three times. The record shows that none of these scheduling delays were the fault of S.T. or her counsel.

The petition to terminate S.T.'s parental rights followed several months of efforts to maintain the family relationship between S.T. and the three children. A Children in Need of Protection or Services (CHIPS) petition was filed on August 3, 2020, based on an allegation that S.T. had repeatedly struck T.J.D. in the head with her closed fist. All three children were removed from the care of S.T. and G.A.H. Following an emergency

3

protective care hearing on August 21, 2020, the district court found that the children would be endangered if released to the care of S.T. and G.A.H. In September 2020, the County filed out-of-home placement plans for all three children based on concerns for the children including a lack of stable housing and means to cover household expenses without the likelihood of eviction; chemical use; and S.T.'s limited capacity to provide adequate supervision to the children and meet their physical, medical, and educational needs. S.T. denied the allegations in the CHIPS petition. Following a hearing on November 17, 2020, all three children were adjudicated in need of protection or services under Minn. Stat. § 260C.007, subd. 6(2)(i), 6(2)(ii), and 6(8) (2022), and the out-of-home placement plans were adopted.

On January 19, 2021, the district court conducted a permanency progress review hearing after which the district court extended jurisdiction over the matter for an additional 180 days. In the summer of 2021, the County filed a petition to terminate the parental rights of G.A.H. to T.F.T. While that petition was pending, the children were returned to S.T.'s home on July 8, 2021, for a trial home visit. The visit was officially terminated on September 20, 2021.

On October 1, 2021, the County first petitioned to involuntarily terminate S.T.'s parental rights to T.F.T. The County proceeded by amending its earlier, still-pending petition to terminate the parental rights of G.A.H. The County served S.T. with the termination of parental rights papers on November 5, 2021. She denied the allegations on November 17, 2021.

S.T.'s trial was initially set to begin jointly with the trial on the petition to terminate G.A.H.'s parental rights on November 29 and 30, 2021. But a number of events resulted in the trial's delay. The district court reset the November 2021 trial dates, explaining that "the parties . . . requested that the Court not bifurcate the permanency trials of [G.A.H.] and [S.T.] and did not believe there would be sufficient time . . . for [S.T.] to be ready for trial." Trial was rescheduled for January 18, 2022. It was subsequently rescheduled for March 21, 2022, after a 300-page-plus disclosure was made by the County on the Friday prior to the January trial date which was scheduled for the following week.[2]

Trial began on March 21, 2022. At that time, the parties and court agreed that the County would present its case first, G.A.H. would present his case next, S.T. would present her case after G.A.H., and the court would take evidence from the guardian ad litem after all parties rested.[3] The district court noted that it expected the trial to take 3½ days.

---

[2] The County has suggested that S.T. was responsible for the continuance in January 2022. We are not convinced by that characterization. All parties appeared for trial on Tuesday, January 18, 2022, the day after the Martin Luther King, Jr. Day holiday. S.T.'s counsel informed the court that he had received a 328-page disclosure from the County on the previous Friday. He emailed the disclosure to S.T. who had read one fourth of the document by the morning of trial. In its order granting a continuance, the district court did not assign fault to either party for the County's delivery of additional disclosures so close to the trial date but observed that the consequence was that "neither the parents' attorneys nor the parents are ready to proceed to trial. As a result, the [c]ourt believes that proceeding to trial would implicate, if not violate, the parents' right to effective assistance from their attorney."

[3] The court of appeals stated that S.T. "had ample opportunity to testify at trial from March 21 to March 24, 2022, and at the continued trial on April 4 and April 5, 2022. It was due to mother's own trial strategy that she did not do so until the last day of trial on June 1, 2022, when she failed to appear." *In re Welfare of Children of G.A.H.*, Nos. A22-1065, A22-1066, 2023 WL 2565105, at *4 (Minn. App. Mar. 20, 2023). We find nothing in the record to support this characterization of the facts.

5

During its case-in-chief, the County called nine witnesses and introduced 72 exhibits. It rested on the afternoon of March 24, the third day of trial. Expressing concern that it could not complete the case in the remaining allotted time, the district court continued the trial until April 5. Thereafter, the district court judge contracted COVID and could not hold trial on April 5, so the trial was continued to May 10 and 11. Due to G.A.H.'s health problems, the trial was not recommenced on May 10 or 11, and the district court continued the trial to June 1 and 2.

S.T. appeared for every trial date before June 1. But S.T. was not present for trial on the morning of June 1, and, when the case was called, S.T.'s counsel had no information about her whereabouts.[4] The County requested that the district court rule that S.T. had failed to appear for trial and proceed in her absence in accordance with Minn. R. Juv. Prot. P. 18.01.[5] Observing that the court had reserved time for the trial on both June 1 and June 2, S.T.'s lawyer requested a 1½ hour continuance until after lunch to reach out to S.T. and assess the situation.

The district court stated that generally a continuance to after lunch "would be the most prudent approach." But the court found that S.T. failed to appear for trial without

---

[4] G.A.H. also was not present for trial on June 1, 2022.

[5] Minn. R. Juv. Prot. P. 18.01 provides that "if a parent . . . fails to appear for . . . a trial after being properly served . . . the court may receive evidence in support of the petition or reschedule the hearing."

6

"adequate cause."[6]  Accordingly, the district court decided to proceed with the testimony of the guardian ad litem and then closed the case at the end of June 1.  In so doing, the court suggested the possibility that S.T. could not arrive in time to hold trial on the afternoon of June 1 and that insufficient time was left on June 2 to complete the case.[7]

The trial proceeded with the testimony of the guardian ad litem.  Near the end of the County's direct examination of the guardian ad litem, the district court learned from the clerk that S.T. had called court administration.  The district court asked the clerk to get S.T.'s phone number so her lawyer could contact her and the direct examination of the guardian ad litem continued.  When it was over, the district court refused to allow counsel for S.T. and G.A.H. to cross-examine the guardian ad litem, reasoning that "your client's not here, so at this point, I don't believe you have the ability to cross-examine, so I'm not going to allow cross-examin[ation] from any party that hasn't appeared in the matter." G.A.H.'s lawyer objected and the district court took a recess to allow S.T.'s counsel to speak with her.

Court reconvened with S.T. present by phone.  S.T.'s counsel explained that S.T. was uncertain as to the date and time the trial was being resumed and although she had

---

[6]     The record shows that S.T. had notice of the June 1, 2022, in-person trial date.  S.T. was present at the May 11, 2022, hearing at which the court orally continued trial to begin June 1, which the court made clear would be in person.  S.T.'s lawyer received written notice that trial would recommence on June 1.  And the same written notice was sent to S.T. by general delivery mail at the Wheaton, Minnesota address that S.T. had provided to the court.

[7]     The district court judge noted that he had other commitments on June 2.  In addition, the record discloses that the County's lawyer was scheduled for a week-long vacation beginning June 3.

attempted to contact counsel for that information several times, she was unable to reach him. The district court did not recognize S.T.'s phone presence as an appearance.[8]

S.T.'s lawyer requested that the district court set a time for S.T. to testify. The district court denied the request. It reasoned that it would have been "more flexible" had the nonappearance occurred earlier in the trial, but that the evidence could not be received in the time remaining for trial on the following day and that the matter was well past all deadlines ("we've gone almost a third of the year just trying to complete this trial"). The district court noted that S.T. had other ways to find out whether the trial was proceeding on June 1 and found that a miscommunication with counsel about the trial date was not sufficient to justify S.T.'s nonappearance. The court closed the trial on June 1, 2022.

On June 15, 2022, the district court entered an order terminating S.T.'s parental rights to T.F.T. on two bases: (1) reasonable efforts have failed to correct the conditions leading to the child's placement outside of the home, and (2) the child is neglected and in

---

[8] The trial transcript does not show that S.T.'s lawyer requested that S.T. be allowed to testify by phone and there was no discussion between the parties and the district court concerning the appropriateness of permitting S.T. to testify by phone on June 1, 2022. Nonetheless, the district court found in its written order terminating S.T.'s parental rights that the County did not agree to allow S.T. to appear by phone and there were no exceptional circumstances warranting such an appearance pursuant to Minn. R. Juv. Prot. P. 11.02. Rule 11.02 provides that "[b]y agreement of the parties, or in exceptional circumstances upon motion of a party or the county attorney or on the court's own initiative, the court may hold hearings and take testimony by telephone or interactive video." Notably, S.T. has not argued before this court that her phone call constituted an appearance or that she should have been permitted to testify by phone pursuant to Minn. R. Juv. Prot. P. 11.02.

foster care. *See* Minn. Stat. § 260C.301, subd. 1(b)(5), (b)(8) (2022).[9] The district court found that S.T. had not established a safe and stable environment for the children—she lacked permanent housing and was unemployed at the time of the trial—and that these conditions were unlikely to change in the foreseeable future. The district court further found that S.T. did not effectively and honestly communicate with the County and other service providers. In addition, the district court found evidence that S.T. used drugs at times during the out-of-home placement, that she became overwhelmed when all of the children stayed with her for several weeks in the summer of 2021, and that the children were filthy at the end of the home visit. The district court also reviewed and approved of the efforts of the County to assist S.T. in resolving the conditions that led to the out-of-home placement and reunify her with the children. It further determined that no additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time. Finally, the district court found that termination of S.T.'s parental rights was in the best interests of the children.

The court also involuntarily transferred permanent legal and physical custody of two of the children, T.J.D. and T.A.D., to their father, A.D., after finding that "[a]ll of the

---

[9] The district court also found that the County failed to establish by clear and convincing evidence that termination of S.T.'s parental rights was justified under some grounds contained in Minn. Stat. § 260C.301, subd. 1(b) (2022). *See id.*, subd. 1(b)(2) (stating that parental rights may be terminated if a "parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship"); 1(b)(4) (stating that parental rights may be terminated if a "parent is palpably unfit"); 1(b)(6) (stating that parental rights may be terminated if "a child has experienced egregious harm in the parent's care").

reasons supporting the termination of [S.T.'s] parental rights to [T.F.T.] support finding that the transfer of custody to [A.D.] is in the children's best interests." *See* Minn. Stat. § 260C.515, subd. 4 (2022).

S.T. moved for a new trial, arguing that procedural irregularities had deprived her of a fair trial. *See* Minn. R. Juv. Prot. P. 21.04 (listing grounds for a new trial). In support of her motion, S.T. argued that trial should not have proceeded in her absence, that she should have been permitted to testify and to call witnesses, and that her counsel should have been allowed to cross-examine the guardian ad litem. Together with her motion, S.T. filed an affidavit outlining testimony she had intended to introduce at trial. The district court denied S.T.'s motion.

S.T. appealed and the court of appeals affirmed. *In re Welfare of Children of G.A.H.*, Nos. A22-1065, A22-1066, 2023 WL 2565105, at *3–5 (Minn. App. Mar. 20, 2023). This court granted S.T.'s petition for discretionary review.

## ANALYSIS

The questions before us are whether the district court's refusal to allow S.T. to testify, cross-examine the guardian ad litem, or call other witnesses—because S.T. did not appear for trial on June 1, 2022—violated S.T.'s constitutional right to procedural due process under the Fourteenth Amendment to the United States Constitution or Article I, Section 7, of the Minnesota Constitution and, if it did, whether the violation materially affected the outcome of the trial so as to require reversal. Although we have serious constitutional concerns about the district court's refusal to continue the trial to allow S.T. to testify, cross-examine the guardian ad litem, and call other witnesses, we ultimately do

10

not decide whether a constitutional violation occurred here. Instead, we hold that if the district court's refusal to continue to the trial violated S.T.'s constitutional rights, the violation did not materially affect the outcome of the trial so as to require reversal.

## A.

We begin with a brief overview of the relevant procedural requirements for termination of parental rights cases set forth in Minnesota statutes and rules.[10] The Minnesota Rules of Juvenile Protection Procedure are intended, in part, to "ensure due process for all persons involved." Minn. R. Juv. Prot. P. 1.02(b). This background purpose is critical because all parents have a fundamental right to the "care, custody, and control" of their children and termination of parental rights permanently deprives a parent of that due-process-protected liberty right. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion) (describing "the interest of parents in the care, custody, and control of their children" as "perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme Court]"); *see also SooHoo v. Johnson*, 731 N.W.2d 815, 820 (Minn. 2007) ("A parent's right to make decisions concerning the care, custody, and control of his or her children is a protected fundamental right."); *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981) (characterizing the significant interest in the parent-child relationship as "plain beyond the need for multiple citation"). Accordingly, the parent has a "commanding" constitutional interest in an accurate and just termination decision.

---

[10] S.T. does not facially challenge the constitutionality of the statutes or rules governing the procedures in child protection cases; her challenge is to the way those rules were applied to her in this case.

*Lassiter*, 452 U.S. at 27.[11]  Further, because "the State has an urgent interest in the welfare of the child, it shares the parent's interest in an accurate and just decision."  *Id.*

Minnesota Statutes § 260C.163, subd. 8 (2022), and the Rules of Juvenile Protection Procedure provide procedural protections to ensure that parents are not erroneously deprived of their fundamental right to a relationship with their children.  These protections include the right to be heard, to present evidence, and to cross-examine adverse witnesses.  Minn. Stat. § 260C.163, subd. 8; Minn. R. Juv. Prot. P. 32.02; *see also In re Welfare of J.W.*, 391 N.W.2d 791, 794 (Minn. 1986) (describing the rights to present evidence, witnesses, and arguments and to cross-examine witnesses in a termination proceeding as "part of the general guarantees of due process").

The Rules of Juvenile Protection Procedure also recognize the importance of "secur[ing] for each child . . . a home that is safe and permanent" without "unnecessary delays in court proceedings."  Minn. R. Juv. Prot. P. 1.02(a), (e); *see also* Minn. R. Juv.

---

[11]    The United States Supreme Court spoke most strongly about parents' fundamental right and interest in the care, custody, and management of their children in *Santosky v. Kramer*:

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life.  If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs.  When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

455 U.S. 745, 753–54 (1982).

Prot. P. 1.02(b) (stating that the Rules of Juvenile Protection Procedure are intended to "provide a just, thorough, speedy, and efficient determination of each juvenile protection matter before the court" as well as to "ensure due process for all persons involved in the procedures"). This is rooted in the "compelling government interest of protecting children." *In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 134 (Minn. 2014). "We require an expeditious resolution of permanency because we will not allow children to linger in uncertainty." *In re Welfare of Child of R.K.*, 901 N.W.2d 156, 162 (Minn. 2017); *see also In re Welfare of J.R., Jr.*, 655 N.W.2d 1, 5 (Minn. 2003) (emphasizing that failure to adhere to the timelines established in the Minnesota Rules of Juvenile Protection Procedure may result in harm to the child).

To that end, we emphasize that district courts must prioritize petitions for termination of parental rights on their calendars. Minn. Judicial Council, Minnesota Judicial Branch Policy 601: Children's Justice Policy (2011) (stating that the policy of the Judicial Branch is to expedite juvenile protection cases "with the goal of serving the best interests of children"); *see also* Minn. Stat. § 260C.151, subd. 1 (2022) ("The court shall give docket priority to any child in need of protection or services or neglected and in foster care, that contains allegations of child abuse over any other case."); Minn. Stat. § 630.36, subd. 2 (2022) (stating that child abuse includes acts of neglect or endangerment of a child as defined by Minn. Stat. § 609.378 (2022)).

The Rules of Juvenile Protection Procedure and Minnesota Statutes also provide specific procedural timelines to ensure that a child is placed in a safe and permanent home as expeditiously as possible consistent with due process. For instance, Rule 52.02,

subdivision 4, sets deadlines for when a trial must commence[12] and provides that "[t]estimony shall be concluded within 30 days from the commencement of the trial, and whenever possible should be over consecutive days." Minn. R. Juv. Prot. P. 52.02, subd. 4. Although the rule allows for continuances and adjournments, a continuance or adjournment may not exceed 1 week "unless the court makes specific findings that the continuance . . . is in the best interests of the child." *Id.* (requiring compliance with Minn. R. Juv. Prot. P. 5.01, subd. 2, when granting a trial continuance or adjournment); *see also* Minn. Stat. § 260C.163, subd. 1(b) (2022) (providing that "[i]n proceedings involving a child alleged to be in need of protection or services and for the termination of parental rights, hearings may not be continued or adjourned for more than one week unless the court makes specific findings that the continuance or adjournment is in the best interests of the child").

In addition, Rule 5.01, subdivision 1, provides that a court should not grant a continuance that would defeat time requirements set forth in the law for permanency decisions. Minn. R. Juv. Prot. P. 5.01, subd. 1 (stating that "the court may continue a . . . trial to a later date so long as the timelines for achieving permanency as set forth in these rules are not delayed"); *see also* Minn. R. Juv. Prot. P. 49.01, subd. 2 (stating that

---

[12] Under Rule 52.02, subdivision 4, trials must commence within 60 days of the first admit/deny hearing. S.T. denied the petition for termination of her parental rights on November 17, 2021, so 60 days from that date was Sunday, January 16, 2022. Trial was first scheduled for November 29 and 30, 2021. That initial trial date was rescheduled for January 18, 2022, and again rescheduled for March 21, 2022, 64 days past the trial timeline. The propriety of those delays under the Rules of Juvenile Protection Procedure are not before us on appeal but—as already noted—those delays are not attributable to the actions of S.T.

14

"the court may . . . continue or adjourn a trial to a later date upon written or oral findings made on the record that a continuance is necessary for protection of the child, for accumulation or presentation of evidence or witnesses, to protect the rights of a party, or for other good cause shown, so long as the permanency time requirements set forth in these rules are not delayed").[13]

These countervailing considerations regarding the parent's procedural protections on the one hand, and the need for an expeditious conclusion of the proceeding for the benefit of the child involved on the other, mean that the rules establishing procedural protections like the right to be heard, to present evidence, and to cross-examine adverse witnesses are not absolute. The Rules of Juvenile Protection Procedure provide that a district court may order termination of parental rights without the participation of the parent if the parent does not appear for trial after proper service. Specifically, Rule 18.02 authorizes a district court to enter an order terminating the parental rights of a parent who fails to appear for trial "[i]f the [termination] petition is proved by the applicable standard of proof." Minn. R. Juv. Prot. P. 18.02. While an order terminating parental rights under Rule 18.02 is referred to as a "Default Order," the rule requires that the State submit clear and convincing evidence to prove that one of the statutory grounds for termination of parental rights set forth in Minn. Stat. § 260C.301, subd. 1(b) (2022), exists. *See In re Welfare of Child of H.G.D.*, 962 N.W.2d 861, 870 (Minn. 2021) (holding that "the district court could not simply accept the allegations in the County's petition as true when mother

---

[13]    The district court continued the trial three times before June 1, 2022. The propriety of those continuances under the Rules of Juvenile Protection Procedure is not before us.

15

failed to appear for the pretrial hearing" because Rule 18.01 requires county social services to prove the allegations of the petition); *Santosky v. Kramer*, 455 U.S. 745, 768–69 (1982) (holding that the Due Process Clause of the Fourteenth Amendment requires the grounds for termination of parental rights to be proved by clear and convincing evidence).

Importantly, a district court is not *required* to proceed with a "default" trial if a parent does not appear. Rather, Rule 18.01 gives the district court a choice: in its discretion, it "may receive evidence in support of the petition" without the participation of the parent or it may "reschedule the hearing." Minn. R. Juv. Prot. P. 18.01.

### B.

With this background in mind, we turn to the central question before us: Did S.T.'s failure to appear at trial on June 1, 2022, justify, consistent with procedural due process, the district court's decision to terminate S.T.'s parental rights without allowing her to testify, call witnesses in support of her case, and cross-examine the guardian ad litem? We first address S.T.'s arguments regarding her failure to appear in person on June 1, 2022, and next address whether S.T. has established that she was materially prejudiced by the district court's refusal to continue or reschedule the trial so as to permit her to testify, call witnesses, and cross-examine the guardian ad litem.

### 1.

We first focus on S.T.'s failure to appear in person for trial on June 1, 2022. S.T. argues that the district court erred when it determined that her failure to appear in person on June 1, 2022, was unjustified and sufficient to trigger the procedures in Rules 18.01 and 18.02. She asserts that she was not specifically notified that she had to appear *in person* at

the trial on June 1. Alternatively, she argues that she did "appear" at the trial on June 1 because her lawyer was present.

S.T. has forfeited these arguments. She made no claim before the district court that she did not know she had to appear in person (as opposed to remotely) or that she effectively "appeared" for trial through her counsel. *See Wesser v. State Farm Fire & Cas. Co.*, 989 N.W.2d 294, 301 (Minn. 2023) (deeming an argument forfeited when not raised in the district court). Rather, in the district court and the court of appeals, S.T. unsuccessfully claimed that she did not have sufficient notice that the trial would recommence on June 1 (as opposed to June 2). But she does not make *that* insufficient-notice argument before us.[14]

Even though the arguments S.T. does press here are forfeited, we note that the district court made clear at the May 11 hearing, which S.T. attended, that the June 1 trial would be in person. Written notice sent to S.T.'s attorney advised in bold print "that a hearing in the above-entitled matter will take place in court at the following date, time, and place" above a box containing the court's address.

---

[14] In any event, Minnesota Rule of Juvenile Protection Procedure 5.02 provides that "[t]he court shall, either in writing or orally on the record, provide notice to the parties and the county attorney of the date and time of the continued . . . trial." The record shows that S.T. was present at the May 11, 2022, hearing at which the court orally continued trial to begin June 1. Review of the transcript of the May 11 hearing shows that the court also made clear that the June 1 trial was in person. Further, it is undisputed that S.T.'s lawyer received written notice that trial would recommence on June 1. Under Minnesota Rule of Juvenile Protection Procedure 9.03, subdivision 1, "if a party is represented by counsel, delivery or service [of court orders] shall be upon counsel." Finally, the record also shows that the same written notice was sent to S.T. by general delivery mail at the Wheaton, Minnesota address that S.T. had provided to the court. *See id.* (stating that service may be made by U.S. mail).

In sum, S.T. has failed to properly offer on appeal any basis for us to determine that the district court's finding that S.T. did not appear at the June 1, 2022, hearing was erroneous.

2.

As discussed above, if a parent fails to appear for trial, the district court has the choice under Rule 18.01 to either reschedule the trial or "receive evidence in support of the petition" to terminate parental rights. Minn. R. Juv. Prot. P. 18.01. If the court elects to receive evidence in support of the petition and that evidence clearly and convincingly establishes one of the statutory grounds for terminating parental rights, it may enter an order terminating parental rights. Minn. R. Juv. Prot. P. 18.02. Here, S.T. argues that "the trial court's refus[al] to continue the trial even to the next day" deprived her of "her right to be heard and her right to cross-exam[ine] a key witness," the guardian ad litem. *See Olson v. One 1999 Lexus MN License Plate No. 851LDV VIN: JT6HF10U6X0079461*, 924 N.W.2d 594, 601 (Minn. 2019) (stating that "[a]t its core, due process requires that the procedures used by the government before depriving an individual of his or her 'protected life, liberty, or property interest' must 'provide [that] individual with notice and an opportunity to be heard at a meaningful time and in a meaningful way' " (second alteration in original) (quoting *Sawh v. City of Lino Lakes*, 823 N.W.2d 627, 632 (Minn. 2012)). She also argues that the district court's refusal to allow her counsel to cross-examine the guardian ad litem who testified on June 1 or call other witnesses on her behalf rendered the trial procedures in this case constitutionally inadequate. "We review questions of whether procedural due process has been violated de novo." *Olson*, 924 N.W.2d at 601.

18

i.

The strong statutory and constitutional preference in termination of parental rights cases is to allow parents to have their day in court—to refute the county's claim that the statutory requirements for termination of parental rights have been satisfied and to explain the parent's side of the story. Again, there are few interests more fundamental than a parent's relationship with her child and few government acts more significant than terminating that relationship. *Santosky*, 455 U.S. at 753–54. The consequences of an erroneous decision terminating parental rights are serious and, as the United States Supreme Court has recognized, the risk of erroneous deprivation in child protection proceedings is "magnif[ied]." *Id.* at 762.[15] Indeed, in termination of parental rights cases, the State, the parent, and the child all share an interest in getting it right. Recognizing these concerns, the Minnesota Legislature has expressly provided that a minor's parent is "entitled to be heard, to present evidence material to the case, and to cross-examine witnesses appearing at [a child protection] hearing." Minn. Stat. § 260C.163, subd. 8; *see Lassiter*, 452 U.S. at 28 (noting that "our adversary system presupposes[ ] accurate and just results are most likely to be obtained through the equal contest of opposed interests").

---

[15] In *Santosky*, the Court discussed common characteristics of termination proceedings that "magnify the risk of erroneous factfinding," including (1) a "complex series of encounters" between the agency, child, and parents; (2) parents' vulnerability to decisions influenced by economic, social, or cultural bias; (3) the disparity of time, money, and expertise between parents subject to termination and the State when preparing for trial; (4) the State's access to expert witnesses, including "professional caseworkers whom the State has empowered both to investigate the family situation and to testify against the parents"; (5) the State's ability to "shape the historical events that form the basis of termination" when "the child is already in agency custody"; and (6) the ability of the State to file repeated petitions if it "initially fails to win termination." 455 U.S. at 762–63.

Based on these fundamental and critical interests, the fact that S.T. was prevented from making her case about why her parental rights should not be terminated is unsettling. That fact alone, however, does not resolve the procedural due process claim in the case.

The State—as long as it has provided adequate notice—can condition the right to be meaningfully heard at a meaningful time on a party's compliance with reasonable procedural steps. In particular, the United States Supreme Court has observed that a State "can, [consistent with due process] enter a default judgment against a defendant who, after adequate notice, fails to make a timely appearance." *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971). Although due process requires notice and an opportunity for a hearing " 'appropriate to the nature of the case,' " it "does not . . . require that the defendant in every civil case actually have a hearing on the merits." *Id.* (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)).

As described above, the Minnesota Rules of Juvenile Protection Procedure expressly provide that parents who do not appear at trial may have their parental rights terminated without the chance to offer their side of the story. Minn. R. Juv. Prot. P. 18.01 and 18.02. Further, written notice of the June 1, 2022, trial date mailed to S.T. and to her counsel, as well as all preceding written notices of hearing in the record, warned S.T. that if she failed to appear for the noticed hearing, there could be dire consequences.[16] Notices warned that the court could "conduct the hearing without [her]," "find that the factual

---

[16] The notice of the June 1, 2022, hearing was sent to the address she had on record with the court but it was returned to the court as undeliverable. S.T. does not claim that she did not receive earlier notices.

allegations and statutory grounds set forth in the Petition have been proved," and "enter an order granting the relief requested in the Petition," including "permanently severing [her] parent[al] rights" and "permanently transferring the child(ren)'s legal and physical custody to a relative." Accordingly, the analysis here turns on whether, after S.T. failed to appear at the June 1 trial date despite having received notice of the date and the consequences of failing to appear, the district court's choice to consider only the evidence introduced by the State—rather than grant S.T.'s request that the trial be continued or rescheduled to allow her to testify and to present other witnesses—was constitutional.[17]

The district court implicated grave constitutional concerns when it decided to proceed under Rule 18.02 rather than granting a continuance to S.T. at the very end of her case. Although we generally review a district court's refusal to continue or reschedule a hearing for a future date for abuse of discretion, *State v. Smith*, 932 N.W.2d 257, 268 (Minn. 2019), as the United States Supreme Court has recognized, there is a point when "a denial of a continuance is so arbitrary as to violate due process."[18] *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). In assessing whether that line has been crossed in a particular

---

[17]    We emphasize that S.T. has not asserted a claim that the Minnesota Rules of Juvenile Protection Procedure—and in particular the default rule set forth in Rules 18.01 and 18.02—are facially unconstitutional. Her claim is that the district court's decision to proceed under Rules 18.01 and 18.02 to close the trial without allowing S.T. to put in her case, rather than continuing or rescheduling the trial to a different date, violated procedural due process.

[18]    Correspondingly, the United States Supreme Court also recognized that "[t]he matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).

case, we look at the reasons offered by the party seeking a continuance when the request for more time is made. *Id.* We are also cognizant that "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render [constitutional rights] an empty formality." *Id.*; *see also In re Welfare of T.D.F.*, 258 N.W.2d 774, 775 (Minn. 1977) (reversing the district court's decision, which refused to continue a hearing on whether to refer a juvenile for adult prosecution, because "[t]he inconvenience of rearranging the court calendar, the rationale advanced by the juvenile court, cannot outweigh [the juvenile's] right to counsel"). In this regard, we emphasize that when considering whether a continuance is feasible, juvenile protection cases must take priority over other cases on the court's calendar. *See* Minn. Stat. § 630.36, subd. 2; *see also* Minn. Judicial Council, Minnesota Judicial Branch Policy 601: Children's Justice Policy.

Considering those factors here, we are troubled that a significant factor in the district court's decision to refuse to continue or reschedule the trial to a future date to allow S.T. to appear and present her case was the time crunch facing that court due to previous delays in the case. We recognize that the children had been without a permanent placement for nearly 700 days, that over 6 months had elapsed since S.T. had denied the termination of parental rights petition, and that more than 30 days had passed since the delayed trial began, far exceeding the timelines set forth in statute and rule. *See* Minn. R. Juv. Prot. P. 52.02, subd. 4 (stating that the trial must commence within 60 days of the first admit/deny hearing and trial testimony shall be concluded within 30 days from the commencement of the trial). These delays plainly run counter to the strong interest in settling on a safe and permanent home for the children without unnecessary delay. *See* Minn. R. Juv. Prot. P. 1.02(a), (e).

22

But S.T. cannot be held responsible for the delays that occurred before June 1, 2022, especially those leading up to, and during, the trial.[19] And prior to June 1, all of the parties and the court apparently underestimated the time the trial would take.[20] Moreover, while the district court found that the time allotted for trial on June 2 would be insufficient to complete the trial, there is no evidence in the record about whether another trial date was available in the following few weeks or, indeed, whether the district court considered that option.[21] The district court's apparent insistence upon expeditiousness at the 11th hour of the case in the face of an arguably justifiable request for a 1-day further delay thus causes us pause.

---

[19] S.T. was not served with the October 1, 2021, petition to terminate her parental rights until November 5, 2021. At that time, all parties and the court agreed that S.T.'s and G.A.H.'s trial should be held jointly. The trial on the petition to terminate G.A.H.'s parental rights set for the end of November 2021 (less than 2 weeks after S.T. denied the petition to terminate her parental rights) did not allow S.T. sufficient time to prepare. The trial was rescheduled for January 2022. On the last business day before the rescheduled trial date, the County served on S.T. over 300 pages of previously undisclosed documents. The trial was again delayed.

[20] After 3 days of trial in March during which the County put on its case, the trial was continued to April 4 and 5, 2022, and then, because the district court judge contracted COVID, it was rescheduled again until May 10 and 11, 2022. The May trial dates were rescheduled because G.A.H. was medically unfit for trial.

[21] Nothing in the record suggests that allowing S.T.'s counsel to cross-examine the guardian ad litem would have extended the trial past June 1. We understand that the district court felt compelled to deny S.T.'s counsel the chance to cross-examine the guardian ad litem because it was proceeding with a "default" hearing under Rule 18.01. Based on our resolution of the case, we have no need to, and do not, decide whether the district court's reasoning was correct.

But we also consider the fact that S.T. had control over whether to be present for the June 1 trial.[22] Although we are sympathetic to S.T.'s argument that she showed up for every other hearing and trial date before June 1, S.T. offered no reason for not appearing on June 1 other than her assertions that she did not have adequate notice of the date and that she did not understand she had to appear in person; factual assertions that we—like the district court and court of appeals—find wanting.

In the end, when faced with a choice to proceed to terminate parental rights without allowing the parent to present her case *or* to continue or reschedule the hearing, a district court should make *every reasonable effort* to allow the parent to present her case without causing unnecessary delay in finding a safe and permanent home for the child—especially where, as here, the parent has shown up diligently and consistently for previous court dates. It is a choice that must be informed in each instance by the profound nature of the parent-child relationship and the substantial consequences of erroneously severing that relationship. Irrespective of whether the district court's refusal to continue or reschedule

---

[22]    Both our precedent and that of the United States Supreme Court consider the responsibility of the party seeking a continuance for creating the situation leading to the need for a continuance. *See Ungar*, 376 U.S. at 590–91 (observing that the party seeking the continuance had time to take steps to hire counsel, obtain needed evidence, and prepare for the hearing); *State v. Vance*, 254 N.W.2d 353, 358–59 (Minn. 1977) (considering among other factors that the defendant waited until the eve of trial to substitute counsel); *State v. Huber*, 148 N.W.2d 137, 141 (Minn. 1967) (considering among other factors that defendant could have located private counsel in the 3 months he was in custody prior to trial); *T.D.F.*, 258 N.W.2d at 775 (concluding the district court abused its discretion in denying a continuance where, through no fault of the party, the party's counsel was unprepared and reasoning that the party "should not be made to suffer the consequences of failure of representation"); *City of Minneapolis v. Price*, 159 N.W.2d 776, 780 (Minn. 1968) (holding that "it is reversable error to deny [a continuance] motion when, without fault of the defendant, the original defense counsel withdraws on short notice").

the hearing was so arbitrary as to violate due process, and while recognizing that the district court's discretion is broad, we observe that on this record, it is far from clear that the district court made the choice we would have made.[23]

ii.

We ultimately, however, need not reach the question of whether, on these facts, the district court's decision to refuse to reschedule the hearing to allow S.T.'s counsel to cross-examine the guardian ad litem and to the reschedule the trial to allow S.T. and her other witnesses to testify crossed the line of being so arbitrary as to violate due process. Even if we assume—without deciding—that S.T.'s rights were violated by the district court's decision not to grant a continuance, S.T. has not shown prejudice warranting reversal.

We have held that a party challenging on constitutional or other grounds a district court's refusal to continue or reschedule a hearing must establish that the party was prejudiced in the preparation or presentation of their case so as to "materially affect the outcome of the trial." *State v. Vance*, 254 N.W.2d 353, 358–59 (Minn. 1977); *see also State v. Courtney*, 696 N.W.2d 73, 81 (Minn. 2005) (stating that the burden is on the party

---

[23] The court of appeals affirmed the order terminating S.T.'s parental rights for different reasons than we do today. The court of appeals determined that the district court's refusal to allow S.T. to testify violated her procedural due process rights to a meaningful hearing but then concluded that the denial of a constitutionally meaningful hearing was "harmless." *G.A.H.*, 2023 WL 2565105, at *4. Because we resolve this case by focusing on the district court's decision to refuse to reschedule the trial, we offer no opinion on the propriety of the court of appeals' legal analysis that denial of the right to a constitutionally meaningful hearing itself can be harmless.

who sought a continuance to show that she was sufficiently prejudiced by the denial of the continuance to justify reversal).

In *State v. Huber*, we said:

> The test for determining whether the denial of a continuance was prejudicial as a violation of the [party's] constitutional rights so as to amount to a denial of due process requiring reversal . . . is whether the [party] has been in some manner embarrassed or prejudiced in preparing his defense so as to materially affect the outcome of the trial.

148 N.W.2d 137, 142 (1967). S.T. has not met that burden. S.T. made no proffer sufficient to show that the testimony that she would have offered or elicited from others would have materially affected the findings and conclusions of the district court for termination, which were supported by the evidence.

We start our prejudice analysis by considering the bases upon which the district court rested its decision. A district court may involuntarily terminate parental rights only if it determines that the County has established by clear and convincing evidence one of the statutory grounds for termination set forth in section 260C.301, subdivision 1(b). We review the district court's findings to determine whether they address the statutory criteria for termination of parental rights and are not clearly erroneous. *In re Welfare of P.R.L.*, 622 N.W.2d 538, 543 (Minn. 2001).

The district court concluded that the County proved that reasonable efforts had failed to correct the conditions leading to the placement of S.T.'s three children out of the home. *See* Minn. Stat. § 260C.301, subd. 1(b)(5) (providing for termination of parental rights if, "following the child's placement out of the home, reasonable efforts . . . have failed to correct the conditions leading to the child's placement"). Among other things, the

26

out-of-home placement plan for the three children identified the following concerns about the lack of a safe and stable environment for the children: lack of stable housing and means to cover household expenses without the likelihood of eviction; chemical use; and S.T.'s limited capacity to provide adequate supervision to the children and meet their physical, medical, and educational needs. The out-of-home placement plan also required S.T. to effectively and honestly communicate with the service providers offering assistance to S.T.

In support of its conclusion, the district court found that S.T. had not established a safe and stable environment for the children: she lacked permanent housing and she was unemployed at the time of the trial.[24] It determined that these conditions were unlikely to change in the foreseeable future. The district court further found that S.T. did not effectively and honestly communicate with the County and other service providers and that she repeatedly engaged in triangulation between the social workers and service providers who were attempting to help reunify the family. In addition, the district court found evidence that S.T. used drugs at times during the out-of-home placement, that she became overwhelmed when all of the children stayed with her for several weeks in the summer of 2021, and that the children were filthy at the end of the home visit.

The district court also reviewed the efforts of the County to assist S.T. in resolving the conditions that led to the out-of-home placement and reunify her with the children as required by Minn. Stat. § 260.012(a) (2022). It noted that the County made cash assistance,

---

[24] Although the district court acknowledged that S.T. held intermittent jobs during the course of the out-of-home placement, she had to leave her job during the summer of 2021 when the children were living with her temporarily.

food support, and energy assistance referrals on S.T.'s behalf. The County also attempted to get S.T. qualified for child-related tax credits; directed S.T. to file applications with local county Housing and Redevelopment Authorities and provided lists of rental properties to assist S.T. to find permanent housing; provided gas cards, volunteer drivers,[25] and paid for repairs to S.T.'s vehicle to meet her transportation needs; referred her to mental health providers; provided S.T. a list of daycare providers and applications for childcare assistance; and provided extensive visitation services to allow S.T. to remain connected to her children. The district court made a specific finding that further efforts would be futile:

> The Court finds that there are no additional services that would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time. None of the multiple social workers or the [guardian ad litem] involved in this case identified any additional service that they believed could or should have been provided to Mother to foster reunification. The Court finds their testimony credible.

Finally, the district court determined that termination of S.T.'s parental rights was in the best interests of the children.

Based on our review of the record, the district court's findings are reasonably supported by the evidence and, therefore, are not clearly erroneous. *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 660–61 (Minn. 2008) (stating that a finding is clearly erroneous if it is either "manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole" (internal quotation marks omitted) (quoting *Tonka*

---

[25] The district court acknowledged that one of the volunteer drivers' vehicles was so cluttered that S.T. and G.A.H. could not ride together and another volunteer driver talked about politics and religion in a manner that made S.T. uncomfortable. But it also found that the County reached out to the drivers and addressed the situations.

*Tours, Inc. v. Chadima*, 372 N.W.2d 723, 726 (Minn. 1985))). The findings are grounded in the testimony of nine witnesses taken over 7 days of trial, as well as hundreds of pages of child protection reports. S.T. stipulated to admission of the child protection reports and had the opportunity to cross-examine the County's witnesses as to whether it made reasonable efforts to reunify the family and to test each witness's credibility. Finally, the district court's findings support its conclusion that the County proved that reasonable efforts for well over a year had failed to correct the conditions leading to the placement of S.T.'s three children out of the home.

Turning to the affidavit S.T. presented in support of her motion for a new trial, we now consider whether the district court's refusal to continue or reschedule a hearing so prejudiced S.T.'s preparation or presentation of her defense as to "materially affect the outcome of the trial." *See Huber*, 148 N.W.2d at 142; *Vance*, 254 N.W.2d at 358–59. As an initial matter, S.T. did not make any offer as to what testimony she would have elicited if allowed to cross-examine the guardian ad litem.[26] Instead, in her affidavit, S.T. explained what she would have said if she had been allowed to testify.[27] S.T. also identified

---

[26] S.T. did not identify in the district court or before us the questions she would have asked the guardian ad litem on cross-examination to undermine the guardian ad litem's credibility, challenge her conclusions, or otherwise explain how S.T. believes the district court's refusal to allow her to cross-examine the guardian ad litem impacted the case. Based on our review of the record, we have not been able to discern what those questions would be. Accordingly, she has not carried her burden of showing how the district court's refusal to allow her lawyer to cross-examine the guardian ad litem materially affected the outcome of the trial.

[27] In her affidavit, S.T. stated that the information provided was not "exhaustive" but instead "just a sampling of the vast information that I would have presented to the Court."

two other witnesses who would have testified as character witnesses on her behalf. We address these in turn.

First, as to the testimony S.T. herself would have offered, she explained why she asked for respite during the trial home visit in the summer of 2021. She stated that she had arranged to move to a four-bedroom farmhouse but that the arrangement fell through when she learned the male landlord would be living with her and her children. She asserted that her house was cluttered near the end of the trial home-visit period because she was packing in anticipation of a move and the children had made a mess with craft supplies. She also averred that she had arranged for two high-school age babysitters to watch the children during the day while she worked but the County refused to approve them. She said that she had been sober for 13 years and claimed that she only tested positive for THC because she used CBD. She noted that a chemical dependency assessment determined she was not in need of any treatment or intervention. She identified several parts of the out-of-home placement plan with which she complied and claimed that her resource worker was unable to provide meaningful assistance because she worked in Otter Tail County and S.T. lived in Pope County. She noted problems with volunteer drivers—which, as the district court noted, the County had addressed—and claimed that the County failed to provide her with gas vouchers. She also claimed that her County case worker was mentally abusive.

---

S.T., however, bears the burden of proving that the district court's decision on termination would have been materially affected if she had been allowed to testify. We cannot assess the impact of potential testimony unless it is provided.

Second, as to other testimony S.T. would have elicited, S.T. identified two other witnesses who would have testified as character witnesses on her behalf. One witness was a life-long family friend who was the father of the two girls who would have babysat her children. According to the affidavit, the witness "was willing to let his girls stay overnight at my house (while I was home) because he trusts me so much and has no concerns about the girls' safety with me." Further, he "could testify as to what a good person I am and how compassionate, loving, and caring I am." The other witness, also a long-time friend, would have testified that S.T. is "a good, loving, appropriate mother to my children over years" and that he would "leave his own children with me."

Critically, nothing in S.T.'s affidavit demonstrates that S.T. had found a home or a stable job that would allow her to provide a safe and stable environment for children. Nothing in the affidavit refutes the examples of times S.T. was dishonest with, or engaged in triangulation between, the social workers and service providers who were attempting to help reunify the family. The affidavit does not point to any additional service that S.T. believes could or should have been provided to foster reunification. Those facts standing alone support the district court's decision to terminate S.T.'s parental rights.[28]

---

[28] We acknowledge that the district court had discretion to deny the County's petition for termination of parental rights even though the County clearly and convincingly proved that statutory grounds for termination exist. *See In re Welfare of Children of J.D.T.*, 946 N.W.2d 321, 328 (Minn. 2020) (emphasizing that termination of parental rights is *always* discretionary). Accordingly, the fact that S.T.'s testimony did not address all of the factual bases for the district court's conclusion—i.e., that reasonable efforts had failed to correct the conditions leading to the placement of S.T.'s three children out of the home—is not dispositive. The district court, however, did determine that it was in the best interests of the children to terminate S.T.'s parental rights.

31

Consequently, we conclude that even if S.T. and her witnesses had testified as outlined in her affidavit, she has not carried her burden to show that testimony would have materially affected the district court's decision to terminate her parental rights.[29]  This is dispositive of her argument for reversal.

## CONCLUSION

Therefore, we affirm the decision of the court of appeals.

Affirmed.

PROCACCINI, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

---

[29]  For largely the same factual reasons, the district court also found that the County clearly and convincingly proved that S.T.'s children were neglected and in foster care. Minn. Stat. § 260C.301, subd. 1(b)(8).  We need not conduct a separate analysis of that determination because if at least one statutory ground alleged in the petition is supported by clear and convincing evidence—and if termination of parental rights is in the child's best interests—we will affirm. *In re Welfare of Children of R.W.*, 678 N.W.2d 49, 55 (Minn. 2004).